UNITED STATES of America

v.

Mahlon A. DIZE, Sr.

UNITED STATES of America

v.

Wayne W. DIZE.

UNITED STATES of America

v.

Geoffrey K. FOX.

UNITED STATES of America

v.

Stephen J. GRAFTON.

UNITED STATES of America

v.

Edgar J. ORME, III.

UNITED STATES of America

v.

Larry W. PENN.

UNITED STATES of America

v.

William W. STONE, Sr.

Nos. 93–0024K to 93–0027K, 93–0034K, 93–0036K and 93–0041K.

United States District Court, D. Maryland.

Oct. 12, 1993.

Lynne A. Battaglia, U.S. Atty., and Robert Thomas, Asst. U.S. Atty., for D. Maryland, Baltimore, MD, for U.S.

Stephen S. Boynton, Vienna, VA, for Edgar J. Orme, III.

John R. Sullivan, Salisbury, MD, for Stephen J. Grafton.

All other defendants appeared pro se.

*MEMORANDUM AND ORDER*

KLEIN, United States Magistrate Judge.

On January 20, 1993, defendants Mahlon A. Dize, Sr., Wayne W. Dize, Geoffrey K. Fox, Stephen J. Grafton, Edgar J. Orme, III, Larry W. Penn, and William W. Stone, Sr.

["defendants"] were hunting migratory birds—Canada geese—on the property known as Jamaica Point Farm ["the farm"] located in Talbot County, Maryland. The hunt was terminated by officials of the U.S. Fish and Wildlife Service ["USFWS"]. The defendants, and others,[1] were charged with various violations of the Migratory Bird Treaty Act ["MBTA"], 16 U.S.C. §§ 703–711. Specifically, all defendants were charged with taking or attempting to take migratory waterfowl with the aid of bait. *See* 50 CFR § 20.21(i). Defendants Grafton and Orme were also charged with aiding and abetting the taking or attempted taking of migratory waterfowl with the aid of bait. *Id.* Defendant Orme was additionally charged with taking or attempting to take migratory birds while possessing lead shot. *See* 50 CFR § 20.21(j).

All defendants pled "Not Guilty," and waived their right to a trial, judgment and sentencing before a district judge. A bench trial on all charges was conducted before the undersigned on July 22–23, 1993. Defendants Grafton and Orme were represented by counsel. All other defendants waived their right to counsel. After the presentation of evidence and closing arguments by counsel and the *pro se* defendants, this Court held the matter *sub curia*. This Memorandum and Order constitutes the Court's findings of fact and conclusions of law.

## FACTS

### 1958–1992

There is really no great dispute among the parties concerning the activities on Jamaica

Point Farm[2] for a number of years leading up to the fall of 1992.

The approximately 400 acre farm was purchased by Mackall O. Owings ["Os" or "Owings"] in 1958.[3] During the ensuing years Os made numerous improvements to the real estate to induce migratory waterfowl to seek refuge on the property. Early on he began feeding Canada geese in an area surrounding his home and the adjoining Manor House. Owings notes in his book, which was written in 1990:

> There is no question that we see the same Canada geese year after year. Years ago, when we were cultivating this concentration, they would arrive in the fall and sit in the river or on the shore or go into the field, but it would be several weeks before they would venture onto our lawn. As years passed, they would come onto the lawn soon after they arrived.

Def. Exh. 3 at 51.

> I am sure that the same geese come onto the lawn every day. They can be identified by their yellow neck bands. We read the numbers on the bands and report them to the Department of the Interior in Washington, who advises us when and where the geese were banded. The recorded numbers provide a constant check on our returning visitors.

*Id.* at 52. Os Owings described his activities with regard to enticing migratory waterfowl to his property as a "sanctuary feeding program." He was also quick to admit that the

---

1. A number of others were also charged with violations of the Migratory Bird Treaty Act. In those cases, the charges were either dismissed or the individuals forfeited collateral.

2. Gov't Exh. No. 2 is an aerial photograph of the farm and the surrounding area. If the photograph is viewed with the notarial seal in the upper left corner of the photograph, Jamaica Point Farm is located in the lower right quadrant. Jamaica Point Road is the tree-lined road running roughly parallel to the right side of the photograph. It meets with Schoolhouse Road which is also tree-lined, runs roughly parallel to the bottom of the photograph, and is perpendicular to Jamaica Point Road. The Manor House is located at the juncture of the two roads. Running from the road juncture towards the bottom

right corner of the exhibit is a tree-lined drive leading to the Owings' residence. Straddling the middle of Jamaica Point Road are three ponds. Another somewhat elongated pond lies between the Owings' residence and the river.

3. Os Owings was originally a defendant in this case. His death occurred before trial and the case against him was dismissed. However, his presence was felt throughout the trial. Constant references were made to him by various witnesses and portions of a book written by him, entitled "The Wizard Is Os", were submitted into evidence without objection by both the government and defendant Orme. *See* Gov't Exh. No. 9 and Def. Exh. No. 3. References from the book were corroborated by testimony of various witnesses.

birds on his property were hunted during the respective seasons.

That Owings was successful in his quest to attract Canada geese to his farm was attested to by several witnesses. George W. Lacey, a special agent/pilot with USFWS testified that his family lived on Jamaica Point Farm in the 1950s before Owings purchased it. He stated that since 1984 he has noticed Canada geese resting in the "feed area" around Owings' home and the Manor House. Over the last four years the concentration of Canada geese on the farm has gotten greater according to Lacey. He has surveilled the property on approximately five occasions over the last five years. According to George N. Ball, Jr., a law enforcement officer with the Maryland Department of Natural Resources ["DNR"], over the past few years there has been a large number of Canada geese on Owings' farm as opposed to other farms in the area. The largest concentration of birds has been in the vicinity of the Owings residence and in the ponds along Jamaica Point Road. Burton E. Wheedleton, a retired DNR officer who is familiar with the farm, also indicated that the farm always had a large concentration of Canada geese when compared to the surrounding farms. Indeed, when Wheedleton was asked by his superiors in 1975 for a recommendation of a place where the department could locate and band large numbers of Canada geese, his recommendation was Jamaica Point Farm.

In his book, Owings states: "We planted crops for geese and *fed corn regularly from the day geese first arrived in October until the last ones left in April.*" Gov't Exh. No. 9 at 190 (emphasis supplied). This evidence of past feeding of Canada geese on the farm was corroborated by the testimony of several witnesses. Officer Ball was on the farm in December 1989 and watched Os and others spread several five gallon buckets of corn around his house. According to Ball, the geese consumed all the corn while he was standing there. Lawrence E. Albright, who currently lives in the Manor house, is familiar with the placement of corn on the farm. He testified that corn was "always" put on the Owings' lawn or off the dock which ad-

joined their residence. In the beginning, it was only buckets of corn, but for the past several years Os started using a spreader. The grain was put out almost every day. Os made the decision as to when and where to spread the feed. Albright indicated that he helped Owings put the feed out up until 1992. Defendant Orme testified that he had helped Owings spread grain and, additionally had asked defendant Grafton to help when Os became unable to do it himself. According to Orme about three bushels or 160 pounds of corn were spread every day.

There was testimony from several witnesses that over the years Owings was warned on several occasions that he should not be feeding during the various hunting seasons. Agent Lacey said that both Willie Parker and Larry Thurman[4] told Os not to spread corn in the front field where he was putting it. In addition, on at least one occasion, Lacey said Thurman took samples of corn from the water around the Owings' property and charged Os with violation of the MBTA. Burton Wheedleton also testified to a telephone conversation he had with Os in 1987. According to Wheedleton, he told Owings "[i]f you are going to feed during the hunting season that's contrary to federal and state regulations. It's illegal." Wheedleton also testified that he never found any corn during hunting seasons. Testifying contrary to these witnesses was defendant Orme who alleged that federal wardens visited the farm many times from 1962 to 1992. They checked licenses, shotguns, bag limits, etc., and never made any "allusions" about hunting over bait.

Apparently there were complaints from those not involved with the farm that the farm was being baited. Lawrence Albright testified that he received complaints of baiting during the second year that the spreader was used to disperse the corn. USFWS Agent Frank T. Kuncir testified that he had received complaints about the farm and possible baiting as early as 1988. Air and ground surveillance at that time showed large concentrations of geese on "the point itself"—i.e., the area around the Owings' residence.

---

4. Both Parker and Thurman are former USFWS agents who retired some years ago.

In 1987, Jamaica Point Farm became one of the first properties, if not the first, to participate in the Sanctuary Program under the auspices of the Easton Waterfowl Festival. According to Lawrence Albright, who was the chairman of the sanctuary program at that time, the purpose of the program is to provide safe areas for geese in the winter. The *raison d'etre* of the program was that the goose population was dropping, habitat was being depleted, and geese were having difficulty finding safe resting areas in the winter. In return for providing a safe sanctuary, the landowner/farmer is paid to leave $1,000.00 worth of crops standing in the fields as food for the geese. It is not part of the program that the geese otherwise be fed by the landowner/farmer. A copy of the contract for the sanctuary program at the farm for the 1991–92 season was placed in evidence as Gov't Exh. No. 11. Mr. Albright emphasized that the program "is not a feeding or hunting program. It is a sanctuary program." The program is managed by the Chesapeake Wildlife Heritage ["CWH"]. John E. Gerber, III, a biologist with CWH, stated that the intent of the program is to provide a grazing area that is a safe haven for birds. It is not the program's intent that the landowner/farmer spread large quantities of loose corn. Mr. Albright, because of the complaints about baiting on the farm decided to "pull the farm out of the sanctuary program" in the summer of 1992. He personally informed Owings of his decision. After that conversation, communication broke down between Albright and Owings. Albright went so far as to ask Owings' son to request that his father stop distributing grain. Owings declined to do so.

### FALL 1992—JANUARY 1993

Frank Kuncir testified that he began surveilling the property in October of 1992 by routinely driving through the farm on public roads. On those occasions he noted large concentrations of geese near the ponds and in the fields. On November 10th, before sunrise, he went onto the farm where he saw approximately 200 geese on the pond adjacent to the hunting blinds. According to the witness, there were approximately 11,000 geese on the farm. He indicated that he walked to a point within forty yards of the Owings residence and did not disturb any geese. Kuncir returned to the farm shortly after sunrise on January 15, 1993, and noticed several hunters in a blind among cedar trees. On January 16th and 17th the farm was surveilled by Officer Lacey. On January 20th, Kuncir returned to the farm with several other agents. He noted that a large flock of geese approached from the north and landed out of his sight in the grassy area around the Owings' residence. Shortly thereafter, a large number of vehicles proceeded towards the barn next to the Manor House. Kuncir heard a tractor start and then saw the tractor pulling a cart with hunters and their gear in it. All hunters went into pits or blinds and hunted for approximately two-and-a-half hours. A map of the farm taken from the Talbot County land records was submitted as Gov't Exh. No. 1. Kuncir marked an "A" on that exhibit where the corn was spread and a "B" where hunters were located in several blinds.[5] At approximately 9:34 a.m. Kuncir terminated the surveillance and contacted the hunters who were in the blinds around the ponds. In the first pit Kuncir found an outdoor writer and his photographer. In the second pit he found four others who admitted that they had been hunting.[6] Kuncir was told by the hunters that both of these blinds were controlled by defendant Orme. Kuncir also found an empty blind which contained two buckets, several expended shells, a cushion and 12 gauge copper coated lead shot. *See* Gov't Exh. No. 10(h). The agent could not testify whether or not these shells had been fired on the 20th. Owings, who was not

---

5. The "C" on the map marks the area where Mark J. Komenda, a Maryland Natural Resources policeman, found other hunters on January 20th.

6. All of this latter group were among the hunters who forfeited collateral rather than stand trial. Charges were dismissed by the government

against the writer and photographer. Some of these individuals are shown in Gov't Exh. No. 10(n). Defendant Orme is shown in Gov't Exh. No. 10(m). Both of these photographs were taken on January 20, 1993 before the hunt was terminated.

hunting on this day, apparently came from his residence and was talking to several agents. Kuncir joined the conversation when Os acknowledged that there was an ongoing feeding operation at the farm. About this time, defendant Grafton arrived at the barn driving Orme's pickup truck. Found in the truck were the bucket seen earlier at the blind, numerous unfired and expended shells, and a box of copper coated lead shot which matched the type of shells found in the blind. Orme appeared dressed in street clothes about three hours after the hunt had been terminated. Orme acknowledged that he had been hunting that morning as well as the ongoing feeding operation on the farm. He also stated that he and Grafton had alternated spreading the corn. After the hunters departed, Kuncir walked the lane from the area of the Manor House to the ponds and found corn on both sides of the road.[7] According to Kuncir, the corn along Jamaica Point Road ran for approximately 568 paces and was ninety-eight paces from the closest blind. No other corn was visible along Jamaica Point Road. He acknowledged that Jamaica Point Road is a public road with trees running along both sides. The witness also admitted that this corn "could be consistent with corn falling off a truck," but "if the corn was the result of spillage, I'd expect to find corn all along the road." Kuncir then inspected the Jamaica Point area and found evidence that large numbers of geese had been present. When he finally left the farm, Agent Kuncir went to defendant Grafton's place of business in Easton, Maryland. Grafton acknowledged that he had had a phone conversation with Orme that morning. Grafton also admitted that he had spread corn on both January 10th and 17th "to hold the birds on the farm." According to Grafton, 240 pounds of corn were spread each day. When told about the corn along Jamaica Point Road, Grafton indicated that it must have been as the result of grain delivery to the farm. Subsequently, Kuncir obtained the records of Trappe Landing Grain Co., Gov't Exh. No. 8, which indicate that between October 1992 and January 1993, approximately 31,900 pounds of corn were delivered to the farm. The last delivery was on January

18th. Kuncir testified that there was a large pile of corn in the barn on January 20th.

George Lacey testified that in early January 1993, he was asked to assist in the surveillance of Jamaica Point Farm. While on the farm on January 16th, he found evidence of hunting, but no corn. On January 17th he observed a large number of Canada geese. At approximately 8:15 a.m. on the 17th a car drove from the Owings' residence to the barn. Lacey heard a tractor proceed from the barn towards the Owings' residence. The witness noticed geese walk away from the Owings' house and toward the tractor. He then saw a reflection of "yellow" being broadcast behind the tractor. The geese then stopped and put their heads down. "Many more geese arrived and it was a feeding frenzy." Lacey took a photograph of someone operating the tractor that morning. *See* Gov't Exh. No. 10(p). While he was on the premises, Lacey noted that a flock of geese took off from the feeding area, went to the ponds and then returned to the feeding area. Another flock came off of the river, over the ponds, and landed in the "baited" area. On January 18th, Lacey returned to the farm and found no one hunting. The next day, he obtained a search and seizure warrant for the tractor and implements. Lacey returned to the farm on January 20th and noted approximately the same number of birds as he had seen previously. He flushed some geese off of the ponds and they flew directly to the feeding area. Around 7:00 a.m., hunters took up their positions in the blinds. Lacey then focused his attention on the feeding area. At 8:40 a.m. he noted a flight take off. Sounds of calls were heard from the ponds, but the geese flew away. Approximately twenty minutes later, another small flock took off, calls were again heard, shots were fired, four birds fell, and the balance of the flock flew back to the feeding area. Gov't Exh. No. 10(j–1) is a photograph of this flight of geese. At 9:11 a.m. another flock took off and veered to the west. A minute later two birds took off followed by twenty more. All of these geese flew toward the ponds. Two geese were killed and the remainder veered off. At 9:35 a.m. the hunt-

---

**7.** This area is marked by a red line running from "1" to "2" on Gov't Exh. No. 1.

ing was terminated. Lacey later went to the Owings' house and told Owings what had occurred. Os' response was "I don't bait, I feed." He admitted that he fed the geese from September through the time they leave in April. Owings told Lacey that he leased the property to Ned Orme to hunt. Up to January 20th, Orme had paid Os $7,000.00 for the season. Os indicated that Orme and a Steve Springer spread the corn for him. Lacey believes that Owings meant Steve Grafton instead of Steve Springer. Later that same day, Lacey executed a search warrant that he had obtained the day before. The subjects of the search warrant were the tractor and related equipment and the barn area. Gov't Exh. Nos. 10(o), 10(d), and 10(e) are photographs of the corn, spreader, and buckets. At the agents' request, calculations were made of the distances to the ponds and the ditch. These distances, which were calculated to be 930 yards (2,790 feet) and 1,633 yards (4,899 feet) respectively, were not significantly different than the calculations made by defendant Orme's expert surveyor, Michael E. Turner, who found the distances to be 2,795.53 feet and 4,666.29 feet respectively. *See* Def. Orme Exh. No. 1. It was Lacey's opinion that both of these areas would be considered "baited."

George N. Ball, Jr., a DNR agent in charge of Talbot, Caroline and Dorchester Counties, Maryland, testified that he is familiar with Jamaica Point Farm, particularly over the past few years. He has seen a large number of geese on the farm as opposed to other farms in the area. Ball stated that geese are attracted to the adjoining Dell farm because they leave a lot of standing corn. The largest concentrations on the farm are in the area of the Owings' residence and in the ponds along Jamaica Point Road. He noted that Talbot County is a natural area for geese. Ball has received several reports of illegal hunting on the farm and, in December 1989, he went to the farm and saw several five gallon buckets in a jeep. He watched "them" put out the feed and also watched as the geese consumed all of the corn in a short period of time. At that time, Ball did not say anything to Owings. Ball testified that he is "generally familiar" with the term "lure and attraction." He stated that the impact of corn on migratory birds is "significant." "The more you put out, the more birds you hold." In his opinion, there was a fairly good hunting success rate on the farm. Ball stated that migratory waterfowl will establish their own flyways so if repeated feeding is conducted, the birds will establish flyways over those areas. He noted that the geese on the farm came into the feeding area and then went to ponds both on and off the farm. However, most geese stayed on the farm. On January 20th, Ball was in the area of the ponds along Jamaica Point Road. There he met four hunters including defendant Grafton. Ball later stopped defendant Fox coming from the ditch area and wearing hunting apparel. At the area of the ponds, Ball talked with Os who stated that he had "never seen that many geese on the roadway." Grafton claimed that the corn in the road was from the "harvest." The witness then noted that there was no natural corn anywhere on the farm. Ball advised Kuncir that he had found corn along the road and later the two of them picked up several samples. The corn was along each side of the road and stopped at the driveway to the Manor House. He did not consider that the road area was a natural place to bait because there were cedar trees on both sides of the road. However, the placement of the corn along the road was not consistent with corn being delivered to the farm because of its location. Ball did not see defendant Orme when the hunt was terminated. Several of the hunters told him that Orme was in the area of the standing corn by the ponds. Later, the witness followed a pickup truck off the farm. The driver of the truck stopped to make a phone call at a pay phone. He then drove to a restaurant on Route 50 where he met Orme in the parking lot. Both then drove into Easton and parked behind some storage sheds. There Ball stopped Orme and was told that Orme left the hunt early to "go to a job." In Ball's opinion, the entire Jamaica Point Farm would be considered a baited area.

Mark J. Komenda, a DNR agent, testified that he was called to the farm on January 20th after the hunt was terminated. He met Lacey on the main road in front of the Manor

House. They then proceeded to the area of the ponds along Jamaica Point Farm. Komenda informed Lacey that he had seen hunters in the ditch area on the western part of the farm. This is the area marked "C" on Gov't Exh. No. 1. There he talked with seven individuals—Stone, Wayne Dize, Mahlon Dize, Penn, and three others. All were dressed in hunting attire and were carrying shotguns. None denied that they were hunting. Two dead geese were seized from this group.

The next witness was DNR Agent Joseph Schauber who was present at the farm on January 20th. Before the hunt began, he was in position on the river's edge one half a mile north of Jamaica Point. Small flights of birds were observed in the area. Around 8:30 a.m., approximately 800 geese approached from the northwest. This flock landed in the feeding area. The witness observed smaller groups leaving the feeding area flying toward the ponds. Schauber indicated that he was familiar with the term "lure and attraction" and the effect of corn on waterfowl. In his opinion, such feeding can control the movements of birds and hold them in a specific area. After the hunt, the witness went with Ball to locate defendant Orme.

On January 5th and 16th, the farm was surveilled by DNR Agent Darren Moore. Each day he was present for twelve to fourteen hours and was located approximately 300 yards from the Owings residence. He observed the flight patterns of the geese and noted that they came from all directions with their main focal point being the feeding area. The geese would then fly from the feeding area toward the ponds along Jamaica Point Road. He did not observe any standing corn but did see stubble. Moore stated that there were "high concentrations of geese in the area."

John E. Gerber, III, who as noted above is a biologist with CWH, testified that he is familiar with patterns of Canada geese in the area. He stated that his job includes building wildlife habitats. Gerber noted that when birds are under the influence of bagged feed, large numbers concentrate in an area where they would otherwise disperse more widely. Geese become addicted to habitual placement of large amounts of feed. The birds are "lazy." They eat the feed and then go to a fresh water pond to graze. When geese are fed "hot" food like corn they like fresh water. The more grain that is fed, the more birds that are likely to be drawn to a particular site. Initially, Gerber stated that "lure and attraction" meant that the spreading of grain would attract birds to an area they would not otherwise use. He later clarified this by saying that geese would use the area in greater numbers and use it more frequently. Such feeding would influence local flocks of birds. In Gerber's opinion, the entire farm is in jeopardy if the farm is baited because all of it is within the zone of influence of the feeding area. He did admit that some geese would use the farm even if no feeding were taking place. However, the farm would not be used by such large numbers of geese.

Lawrence E. Albright testified that he has hunted on the farm for about seven years and is familiar with the placement of the corn on the farm. Corn has always been put on the Owings' lawn and off the dock. In the beginning, corn was spread daily out of five gallon buckets, but in the last several years it has been spread with a tractor using a spreader. While Albright helped cast the grain until several years ago, the corn is now put out by Orme and Grafton. He indicated that he never felt that such feeding was illegal while he was spreading the corn.

Burton E. Wheedleton, a retired DNR agent, testified that in his opinion, the more geese are fed the more birds they will be attracted. He also noted that Canada geese become "imprinted" in an area when they are fed regularly.

Defendants presented the testimony of Michael E. Turner, a registered professional surveyor, who, as noted above, calculated the distances from the feeding area to the various hunting blinds. His calculations are noted on Def. Orme Exh. No. 1.

Defendant Edgar J. Orme, III, testified that he first became acquainted with Owings in 1962 and that he started hunting on the farm as a guest about twenty-five years ago.

According to Orme, Os added three fresh water ponds and the pond on the point to property in his early years of ownership. Owings "always" left standing corn in the field. "He did everything he could to encourage wildfowl to come to Jamaica Point Farm through the use of crop rotation, etc." Orme paid an annual fee to hunt the farm. In October 1992, Os asked the witness to assist him in spreading the feed. Orme talked to Grafton who agreed to help Owings in return for the right to hunt the farm. The frequency and placement of the corn was controlled by Os. This defendant indicated that the feeding was performed from October 1992 to April 15, 1993. The corn was delivered to the farm in a one ton open bed truck. Prior to the hunt, Orme last spread the corn on January 1st. The last delivery before the hunt in question was on January 18, 1993. Orme admitted that he knows that "geese like corn." On January 20th, Orme, Wallace, Hambleton, Grafton, Bugbee, Chambers, Little and Hornberger were hunting at the ponds. Stone, Fox, the two Dize brothers, Penn, and Floyd were in the ditch in the back field. A total of nineteen hunters were present. Ten geese were killed—eight at the ponds and two in the back field. Orme marked his hunting blind on the morning in question as "C" on Def. Orme Exh. No. 1. This position placed him near the ponds on Jamaica Point Road. He claimed that no one at this blind ever fired a shot and expressed surprise that any expended shells were found in that area. Sometime between the start of the hunt and its termination, Orme stated that he left the farm, went home and changed into business clothes. Later he was phoned by "someone" whom he later met at a restaurant in Easton. The two of them then met defendant Stone. Orme testified that he was not the president of a hunting club he just collected the money and paid Os. He also paid for fertilizer and "some standing corn." Later in his testimony, Orme indicated that he "only collected monies from members of 'his club.'" According to the witness, "club members" would call him to make arrangements for a hunt. On January 20th, the Dize brothers and Fox were guests of other club members, Penn was a guest of Orme's, and Stone was a member of the club.

Although he testified that he never asked any "wardens" if it was alright to hunt when corn was placed on the farm, Orme stated that he "felt" that he had "official" permission to hunt while the feeding program was in process. Additionally, it was defendant Orme's opinion that "we were far enough removed from the corn to be out of the zone of influence."

The third witness for the defense was George Ray Arnett, a consultant, who was Director of the California Fish and Game Department from 1968 to 1975. Mr. Arnett was also an Assistant Secretary of the Interior under President Reagan from 1981 to 1986. An avid hunter who has hunted throughout the world and is closely connected with numerous organizations, Mr. Arnett stated that he has hunted the farm as many as fifteen times. He always asked if there was any bait present. The witness admitted that he "knew what [Owings] did down by the ponds." In his opinion, Arnett felt that there was no violation of the hunting regulations on Jamaica Point Farm.

Charles S. Conner, a writer, publisher and hunter from Memphis, Tennessee, testified that he has written "extensively" on the issue of baiting especially along the Atlantic flyways. Mr. Conner has been used as a "resource" for the USFWS over the past fifteen years. He has hunted the farm "six or seven times with a gun and twice that with a camera." While he was aware of the "feeding program," Conner had no concerns because "he had no reason to believe that the birds would be lured to the hunting sites." In his opinion the "zone of influence" did not include the blinds on Jamaica Point Farm.

The final witness in this case was defendant Mahlon Dize who testified that he was a guest in a blind in the northwest corner of the farm. He denied having anything to do with the feeding or the baiting.

## THE ISSUES

From the government's perspective the only issue in this case is whether or not Jamaica Point Farm was a "baited area." A sub-issue is whether or not the blinds on the

**1178**

farm were within the "zone of influence" of the bait.

Of course, defendants deny that the farm is a baited area. Further, they claim that even if it is determined to be a "baited area," the blinds used on January 20th were outside the "zone of influence." Other defenses raised include, "somebody else did the baiting, therefore these defendants are 'not guilty' "; "entrapment by estoppel"; "prosecution of these defendants would be 'unfair' "; and the hunters had "every reason to believe that the program was within the law." [8]

■ To prove a case against all the defendants for taking or attempting to take migratory birds by the aid of bait or over a baited area, the government must prove beyond a reasonable doubt (1) that the farm was a "baited area" within the meaning of 50 CFR § 20.21(i); (2) that the defendants took or attempted to take migratory birds over the baited area; and (3) that the birds involved were migratory birds.

■ All of the defendants, with the exception of defendant Orme, were found in the vicinity of hunting blinds and none denied that they were in fact hunting on January 20th. Thus, the second element is admitted by all defendants. While Orme was not found at the scene, he did admit in his testimony that he had been hunting on the farm the morning of January 20th. Additionally, as none of the defendants pressed the issue of whether or not geese are "migratory" within the meaning of either the statute or the regulations, they have basically conceded this element—as indeed they must. Thus, the only real element in contention under these charges is whether or not the farm was a "baited area."

To convict defendants Orme and Grafton of aiding and abetting, the government must again prove beyond a reasonable doubt that: (1) the farm was a "baited area;" and (2) that these two defendants aided and abetted the other defendants in the taking or attempted taking of migratory birds either by the aid of bait or over a baited area.

Finally, for defendant Orme to be convicted of the lead shot charge, the government must prove beyond a reasonable doubt that while taking or attempting to take migratory birds Orme had such shot in his possession. *See* 50 CFR § 20.21(j).

*THE LAW*

The Migratory Bird Treaty Act ["the Act"], 16 U.S.C. §§ 703–711, provides in § 703:

> ... it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any migratory bird ...

The Secretary of the Interior is authorized to promulgate regulations under the Act. Pursuant to that authority the Secretary has issued 50 CFR § 20.21, the primary regulation at issue here. That regulation provides in part:

> Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No persons shall take migratory game birds:
>
> .     .     .     .     .
>
> (i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing or scattering of shelled, shucked, or unshucked corn ... so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn ... or other feed whatsoever capable of luring, attracting, or enticing such birds is directly distributed, or indirectly placed, exposed, deposited, distributed, or scattered; and such area shall remain a baited area for 10 days following complete removal of all such corn ... However, nothing in this paragraph shall prohibit:
>
> (1) The taking of all migratory game birds, including waterfowl, on or over standing crops, flooded standing crops (in-

---

**8.** The Court finds that there is no merit to any of the "other defenses" raised by various defen-

dants and will not address them specifically in this Memorandum and Order.

cluding aquatics), flooded harvested croplands, grain crops properly shucked on the field where grown, or grains found scattered solely as the result of normal agricultural planting or harvesting; and

(2) The taking of all migratory game birds, except waterfowl, on or over any lands where shelled, shucked, or unshucked corn ... or other feed has been distributed or scattered as the result of *bona fide* agricultural operations or procedures, or as the result of manipulation of a crop or other feed on the land where grown for wildlife management purposes: *Provided, That manipulation for wildlife management purposes does not include the distributing or scattering of grain or other feed once it has been removed from or stored on the field where grown[.]*

(Emphasis added).

### "BAITED AREA"

As noted above, the Secretary's regulations define a "baited area" as:

any area where shelled, shucked, or unshucked corn ... or other feed whatsoever capable of luring, attracting, or enticing such birds is directly distributed, or indirectly placed, exposed, deposited, distributed, or scattered....

50 CFR § 20.21(i).[9] It is clear from this regulation that the feeding of migratory birds is not prohibited *per se*. Rather the regulation prohibits feeding of migratory birds in a way that lures them to areas where hunters are stationed. Defendants do not seem to dispute that at least a part of the farm—the area around the Owings' residence—would fit the definition of a "baited area" in the regulations. The argument is that the so-called "zone of influence" rule should be applied to the blinds in which they were hunting. "The zone-of-influence rule is apparently not a formal, published rule, but a means of ascertaining or describing in practice the extent of a baited area in a given case." *Manning*, 787 F.2d at 437. The defense argues that this zone of influence must be calculated with some exactitude and that

the distances involved here do not fall within the zone. "It is true that such an area is not subject to exact definition and may expand or contract with changes of wind and weather, but hunters must make many such judgments as these in order to hunt at all." *Yandell v. United States*, 550 F.Supp. 572, 576 (N.D.Miss.1982), *aff'd*, 712 F.2d 218 (5th Cir.1983). "The extent of that area 'is defined only by the capacity of bait placed anywhere within it to act as an effective lure[.] ... Congress must have intended for the violation to turn on the factual determination that birds are being lured to a hunter's shooting location, *no matter how far the bait is from that location*[.]'" *Manning*, 787 F.2d at 437–8 (*citing United States v. Chandler*, 753 F.2d 360, 363 (4th Cir.1985)) (emphasis added).

Applying these guidelines to the facts of this case, it is clear to the Court that all defendants were taking or attempting to take migratory birds (geese) over a baited area. There is ample evidence, as noted above, from agents who watched the flight patterns of geese over the farm for a period of time that the birds approached the "feeding area" from all directions, that after feeding most geese flew to the freshwater ponds along Jamaica Point Road to drink, graze or rest. If they did not go to the ponds, the geese departed in all directions. This *modus operandi* was confirmed by John E. Gerber, III, a biologist, whose qualifications as an expert were not challenged. Gerber's testimony that the actions of Owings over the years caused the geese to "imprint" on the farm, and that without the so-called "feeding program" the farm would not be used by such large numbers of birds, is likewise, unchallenged and, the Court finds, most believable.

As far as the distances from the "feed area" to the blinds are concerned, it is true that they might be deemed "considerable." Two factors mitigate against any finding that the blinds were too far away from the bait to be outside the zone of influence. The first is that the patterns described by the witnesses clearly demonstrate that the "feed area" act-

---

9. The constitutionality of this regulation is not challenged here. Such an attack would be fruitless. *See United States v. Manning*, 787 F.2d

431, 437 (8th Cir.1986); *United States v. Jarman*, 491 F.2d 764, 766 (4th Cir.1974).

ed as a lure and attraction to the geese and without the "feed area" geese would not be attracted to the farm. The geese flew toward the blinds after feeding because of the corn in the "feed area." A second factor seems to have been overlooked by the defense. Corn was found along Jamaica Point Road within ninety-eight (98) paces of the ponds. How the corn got there is not a proper inquiry. Neither is who put it there or who knew it was there. *See Chandler*, 753 F.2d at 363. Certainly a normal pace can be no more than four feet. If that is the case, there was bait within 400 feet of the ponds along the road. Likewise, the distance to hunting site "A" as shown on Def. Orme's Exh. No 1 is approximately halved. The Court finds beyond a reasonable doubt that all the blinds in use on January 20th were within the zone of influence of either the "feed area" around the Owings' residence or the corn found along Jamaica Point Road. Such a conclusion requires a finding of "guilty" as to the charge of hunting over a baited area against all defendants.

## AIDING AND ABETTING

■ To convict defendants Orme and Grafton of aiding and abetting, the government must demonstrate beyond a reasonable doubt that each of these defendants "knowingly associated himself with and participated in the criminal venture." *Flowers v. Tandy Corp.*, 773 F.2d 585, 590 (4th Cir.1985) (*citing United States v. Winstead*, 708 F.2d 925, 927 (4th Cir.1983)). It is not necessary for the government to show that the individual defendants participated in every step of the criminal enterprise; it need only "show participation at some stage accompanied by knowledge of the result and the intent to bring about that result." *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir.1983) (*quoting United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir.), *cert. denied* 429 U.S.

819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976)), *cert. denied* 465 U.S. 1028, 104 S.Ct. 1289, 79 L.Ed.2d 691 (1984). Of course, if a defendant is convicted as a principal that defendant can not be convicted as an aider and abetter.

As noted above, the facts that the farm was a baited area and that all defendants were indeed hunting over a baited area on January 20th have already been proven. The evidence is also clear that the corn was placed in the "feed area" [10] for the sole purpose of attracting geese; that at least defendant Orme knew the purpose for placing the corn in the "feed area"; and that Orme knew the farm would be hunted during the season. In addition, defendant Orme collected money from the hunters and made "arrangements" for their hunting. This evidence is sufficient for the Court to conclude that Orme is guilty of this offense beyond a reasonable doubt.

Defendant Orme testified that he asked defendant Grafton to assist Os in spreading the corn and that he and Grafton were the only individuals spreading the corn during the period in question. Orme last spread corn on January 1, 1993, before the day of the hunt. Agent Lacey testified that he saw an individual spread corn on January 17th, and took a picture of the individual on the tractor pulling the spreader. *See* Gov't Exh. No. 10(p). The individual in the picture certainly cannot be identified with particularity. However, Orme and Grafton were the only ones spreading the corn during the period leading up to the hunt and, as he testified, Orme last spread the feed on January 1st. A reasonable inference could be drawn that the person spreading the corn as Lacey watched was defendant Grafton. The Court therefore finds that Grafton did indeed aid and abet in the taking, or attempted taking, of migratory birds over a baited area on January 20, 1993 and is guilty of the offense charged.[11]

---

**10.** There is absolutely no evidence that either Orme or Grafton had anything to do with the placement of corn along Jamaica Point Road on or prior to January 20th.

**11.** It is somewhat troubling to the Court that the government chose to charge Orme and Grafton with aiding and abetting by way of a single violation notice which parenthetically indicates

"(18 counts)." *See* Local Rule 304(1)(i) which states that "[e]xcept in exceptional circumstances, a violation notice or citation shall charge only one offense." It would certainly seem to be a better practice to use an Information which could set out the charges with greater particularity. No objection was filed by either defendant to the charging document and, even if it had, the government could have dismissed the

According to the evidence, nineteen hunters were present in the fields on January 20, 1993. Since neither Orme nor Grafton can be convicted for aiding and abetting themselves, especially when each has already been convicted as a principal Orme and Grafton could only aid and abet eighteen hunters. The question arises as to whether an individual can be convicted of aiding and abetting a fellow aider and abetter. Such a result seems illogical. Therefore, the Court finds defendants Orme and Grafton each guilty of seventeen counts of aiding and abetting.

### POSSESSION OF LEAD SHOT

Only defendant Orme is charged with taking or attempting to take migratory birds while possessing lead shot. While there is evidence from which the Court could find that Orme was in possession of lead shot on January 20th, the evidence does not persuade beyond a reasonable doubt. The evidence is, therefore, insufficient to convict Orme of this charge.

### CONCLUSION

For the reasons stated above, the Court finds defendants Mahlon A. Dize, Wayne W. Dize, Geoffrey K. Fox, Stephen J. Grafton, Edgar J. Orme, III, Larry W. Penn, and William W. Stone, Sr. guilty of taking or attempting to take migratory birds with the aid of bait. Further, the Court finds defendants Stephen J. Grafton and Edgar J. Orme, III each guilty of seventeen counts of aiding and abetting in the taking or attempting taking of migratory birds with the aid of bait. Finally, the Court finds defendant Edgar J. Orme, III, not guilty of the charge of taking or attempting to take migratory birds while possessing lead shot.

Sentencing for all defendants is scheduled for the 10th day of December, 1993 at 10:00 a.m. in Courtroom 2E, United States Courthouse, 101 West Lombard Street, Baltimore, Maryland. Counsel for defendants Grafton and Orme will be notified when to have defendants Grafton and Orme report for presentence investigation interviews. The Court does not deem such interviews necessary for the other defendants.

complaint and begun the proceedings again by filing an Information.