**UNITED STATES of America, Plaintiff,**

v.

**Bruce R. HOGAN, et al., Defendants.**

**No. 95–30014.**

United States District Court,
C.D. Illinois,
Springfield Division.

Nov. 15, 1995.

---

Gregory M. Gilmore, Asst. U.S. Attorney, Springfield, IL, for plaintiff.

Jon Gray Noll and Jeffrey T. Page, Springfield, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

Migratory bird case.

Bench trial.

Did these duck hunters shoot ducks over baited ground?

The evidence dictates the finding: guilty.

### I. Background

On September 30, 1994, United States Fish and Wildlife Agents Jerry Sommers, Tim Santel, and John Decker conducted a routine air patrol over the Illinois River's waterfowl areas. A pass over the Long Lake Area revealed mowed areas of a planted crop around duck blinds. The agents photographed the area.

Over the next few weeks, Sergeant John Will of the Illinois Department of Conservation determined which sites in his district would be inspected for baiting violations. Sergeant Will directed Officers Blaine Eickelshulte and Jeffry McCartney to inspect the Long Lake Area.

During the early morning hours of October 24, 1994, Officers Eickelshulte and McCartney walked onto the premises of the Long Lake Duck Club. Officer Eickelshulte approached the middle duck blind—the 6 o'clock blind—and observed mowed millet stalks and seeds floating throughout the duck blind area. The area immediately in front of the 6 o'clock blind—the blind hole—was mowed in the shape of a circle, approximately 40 to 50 yards in diameter. Two other blind holes were present in the area: a 3 o'clock hole, approximately 80 to 100 yards northeast of the 6 o'clock hole; and a 9 o'clock hole, approximately 160 to 200 yards southwest of the 6 o'clock hole.

Officer Eickelshulte took a sample of what appeared to be cut or mowed vegetation from the 6 o'clock blind. Officer Eickelshulte observed straight edges and cut marks on the stalks of vegetation. The straight edges and cut marks were evidence that the vegetation had been mowed.

On October 25, 1994, Officer Eickelshulte and another State Conservation Officer, and Agent Sommers flew over Long Lake. Photographs of the area were taken. The photographs revealed two flooded impoundments, a south impoundment and a north impoundment. The south impoundment consisted of approximately 90 acres and contained three duck blinds.

On October 27, 1994, the opening day of duck season in the Central Illinois Region, an investigation by law enforcement officials was conducted at the Long Lake Duck Club. Officer Eickelshulte, Officer Tim Gamble, Agent Decker, Agent Sommers, Sergeant Will, and Illinois Department of Conservation Captain Mark Ottis conducted the investigation.

The law enforcement officials walked onto the premises of the Long Lake Duck Club. The officials separated into three groups and each group observed one of the three duck blinds in the south impoundment. Shortly thereafter, Defendants travelled in vehicles from the clubhouse to the blind areas. Three Defendants entered each blind. Upon entering the duck blinds, Defendants began to call and shoot at ducks. Two hen ducks were killed at the 6 o'clock blind and one drake duck was killed at the 3 o'clock blind. A shot was fired from the 9 o'clock blind, but no kill resulted.

After approximately an hour of shooting, the officials approached Defendants at the respective blinds they had been observing. The officials identified themselves and proceeded to conduct a routine "hunter check" of Defendants. Two of the Defendants were cited for possessing lead shot shells.

Officer Gamble inspected the area around the 9 o'clock blind. Mowed millet with seed heads scattered throughout the flooded blind area were found. Sergeant Will and Agent Decker inspected the area around the 6 o'clock blind. Mowed millet with seed heads were found throughout the flooded blind area. Officer Eickelshulte and Agent Sommers inspected the 3 o'clock blind area. Mowed millet with seed heads were found throughout the blind area. Two samples of the millet seed heads were taken, one from

the 3 o'clock blind area and one from the 6 o'clock blind area.[1]

Following the blind area inspections and the "hunter check," Defendants were instructed to return to the clubhouse area so that the observed violations could be explained. Defendants stated that they had indeed planted millet and mowed it, but that they had removed it. Defendant Randy Vogel stated that he had raked and removed the mowed millet. Officer Eickelshulte explained that the millet obviously had not been removed. After some discussion, Vogel stated, "Well, you're obviously not going to change his mind, I'll take care of it with a phone call." Brett Manning, the Illinois Director of Conservation, and Vogel were friends. After completing some paperwork, the officials departed the Long Lake Duck Club.

A couple of hours later, Captain Ottis received a call from his supervisor, Chief Closson of the Illinois Department of Conservation. At the direction of Director Manning, a site visit was to be conducted at Long Lake.

Chief Closson, Captain Ottis, Sergeant Will, and Agent Decker met Defendants Vogel and Bruce Hogan at Long Lake. The officials inspected the Long Lake Area and reconfirmed their initial conclusion that the area was baited for waterfowl. The officials observed rows of mowed vegetation submerged under water around the hunting blinds.

Vogel, while walking through the flooded area of the south impoundment, stated that he had burned all of the mowed millet. When asked where he had burned the millet, Vogel stated that he had not burned it, but that the millet was burned by another person from the hunting club. Vogel was asked where the burning occurred. Vogel had no answer. Vogel then stated that the millet plants were not mature when the millet was mowed; thus, there were no seeds on the millet to serve as duck food. Captain Ottis reached into the water and grabbed handfuls of the mowed millet near the 6 o'clock blind area; he squeezed the millet and felt hard

seeds. When confronted with this fact, Vogel reached into the water, grabbed some millet, and acknowledged that seeds were in fact present.

Next, Vogel stated that the millet was mowed so that it would be easier to retrieve downed ducks in the flooded areas. When asked why Long Lake did not allow natural vegetation to grow instead of going through the effort and expense of planting and mowing thick crops, Vogel responded that providing the ducks with a lot of food was the only way Long Lake could compete with the other surrounding hunting areas.

Defendants were cited for taking or attempting to take migratory birds over a baited area in violation of 16 U.S.C. § 703.

## II. Discussion

■ Pursuant to The Migratory Bird Treaty Act ("the Act"), 16 U.S.C. § 703, "Unless and except as permitted by regulations . . . it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird . . . ." To establish a violation of the Act, the Government must prove beyond a reasonable doubt that:

(1) the area was baited, as defined by 50 C.F.R. § 20.21;

(2) the defendants took or attempted to take migratory birds over the baited area; and

(3) the birds involved were migratory birds.

*United States v. Dize*, 839 F.Supp. 1170, 1178 (D.Md.1993).

■ All of the Defendants were confronted in duck blinds and possessed shotguns and shotgun shells. Further, they had killed a total of three ducks and fired shots at others on the day that they were confronted by the law enforcement officials. Ducks are migratory birds. Accordingly, elements 2 and 3 are not at issue. Indeed, Defendants conceded elements 2 and 3 at trial and in their brief submitted to the Court. Thus, the only issue is whether the area over which

---

1. The sample from the 3 o'clock blind was later identified as muhlenbergia, a/k/a wirestem muh-   ly, and not millet.

Defendants took and attempted to take migratory birds was "baited."

The Federal Regulations promulgated pursuant to the Act provide insight into whether a particular area was "baited:"

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds:

(i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed exposed, deposited, distributed, or scattered....

However, nothing in this paragraph shall prohibit:

(1) The taking of all migratory game birds, including waterfowl, on or over standing crops, flooded standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely as the result of normal agricultural planting or harvesting....

50 C.F.R. § 20.21. Based on the definition of a "baited area," the Court has little difficulty concluding that Defendants hunted over a "baited" area.

Before discussing our findings and conclusions, it is important to note that the prohibition against taking or attempting to take migratory birds over a "baited area" is essentially a strict liability crime. *United States v. Manning,* 787 F.2d 431, 435 n. 4 (8th Cir.1986); *United States v. Chandler,* 753 F.2d 360, 363 (4th Cir.1985); *United States v. Catlett,* 747 F.2d 1102, 1104 (6th Cir.1984); *but see United States v. Delahoussaye,* 573 F.2d 910, 912–13 (5th Cir.1978). Thus, as long as the area qualified as "baited," Defendants are liable regardless of whether they *knew* the area was in fact "baited."[2]

As evidenced by the Federal Regulations, hunting over crops or areas which contain food preferred by ducks is not *per se* unlawful. Problems arise, however, when the hunters manipulate the hunting area such that the preferred food lures or attracts the ducks in an "unnatural" manner.[3] Here, it was undisputed that the Long Lake Duck Club planted and mowed crops of millet[4] in the hunting area.[5] Testimony at trial indicated that millet is one of the finest lures or attractions for shallow water ducks. There was nothing improper about hunting over crops of millet. Problems arose, however, when the Long Lake Duck Club decided to cut or mow the millet. By cutting or mowing the millet, the Long Lake Duck Club created an "unnatural" lure or attraction for the ducks. After the millet was cut, the area was flooded—creating "unnaturally" a large area of scattered millet floating at or near the surface of the shallow water.[6]

There is no doubt that such conduct constituted as creating a "baited area" for purposes of the Act. Defendants, however, at-

2. Based on the facts of the instant case, we conclude that Defendants were aware of the fact that the area was "baited."

3. By use of the term "unnatural," we mean something that occurred with the aid of man, *i.e.,* something that would not have occurred in the absence of man's interference or ingenuity.

4. Specifically, the millet is known as a proso-type of millet.

5. There was also a forage crop known as muhlenbergia or wirestem muhly present in the hunting area. However, there was conflicting testimony as to whether ducks would eat the seeds produced by that plant. Thus, for purposes of this order, we will assume that muhlenbergia will not lure or attract ducks to the hunting area.

6. The act of flooding the area was not at all improper. A violation will not occur if an area containing millet or some other food preferred by ducks is flooded. Only if the crops or duck food is "unnaturally" scattered or dispersed—by mowing or cutting, without burning or removal—in the flooded area will a violation ensue.

tempted to avoid liability by advancing two arguments: first, Defendants argued that after they mowed the millet, they raked and burned it thereby removing the millet from the hunting area; and second, Defendants argued that the seed heads on the millet were immature and ducks will not eat immature seeds, thus, the area did not act as a lure and therefore was not "baited." The Court is not persuaded by either of those arguments.

Regarding the first argument, it seems clear to the Court, based on the testimony of the law enforcement officials and pictures taken at the scene, that the cut millet was not removed from the hunting area. Furthermore, the testimony offered to contradict the law enforcement officials' testimony and picture evidence was not credible.

Indeed, on the day Defendants were cited, Vogel stated that he had burned the cut millet; but, when asked where the millet was burned, Vogel then changed his story and stated that another individual burned the millet. Vogel was unable to state where the burning occurred. At trial, Virgil Gobel, an employee and the caretaker of the Long Lake Duck Club, testified that he and his wife raked and burned all of the cut millet in front of the 6 o'clock blind and burned, without raking, the cut millet in front of the 9 o'clock blind on the evening of October 2, 1994. The law enforcement officials testified that the area in front of the 6 o'clock blind was approximately 40 yards in diameter; Gobel testified that the area was a little larger than our courtroom. Gobel testified that all the raking and burning occurred in approximately 1½ hours. We find it rather difficult to believe that Gobel and his wife could perform the work in such a short period of time.

Next, Gobel testified that, because the millet and other vegetation was so dry, no accelerant was required to burn the cut plants. But, the pictures taken by the law enforcement officials on September 30, 1994, show a green crop. Finally, Gobel testified that he and his wife maintained a log book which recorded the work performed by himself and other club members. Yet, for some unknown reason, there was no entry in the log book on October 2, 1994, acknowledging the raking and burning of the millet. Accordingly, we can not find Gobel's testimony credible. Thus, we conclude that the mowed millet was not removed from the hunting area.

This takes us to Defendants' second argument that the seed heads on the cut millet were not mature and ducks will not eat immature seeds, thus, the hunting area was not "baited" since it did not act as a lure or attractant. There was conflicting testimony as to whether ducks will eat immature seeds. For purposes of this order, the Court will assume that ducks will not eat immature seeds. Regardless, expert witness Glenn Raines—a research agronomist for the University of Illinois and superintendent of the Agricultural Research and Demonstration Center in Pike County, Illinois—testified that mature seeds were present in both of the millet seed head samples collected by the law enforcement officials from the mowed millet located in front of two of the three blind holes.[7]

Furthermore, the testimony at trial established that mature seeds are hard seeds, in contrast to immature seeds which are soft, mushy, and can be crushed when squeezed.[8] On the day Defendants were cited, the law enforcement officials reached into the water and obtained seed heads from the cut millet; they squeezed the seed heads and noted that hard seeds were present. When confronted

---

7. Recognizing that mature seeds were present, Defendants attempted to show at trial that the mature seeds could have come from the adjacent standing, uncut millet. However, the law enforcement officials' testimony established that they were careful to select only seed heads from the cut millet surrounding the blind holes. The officials also noted that is was possible that some of the individual mature seeds in the samples could have fallen off the uncut millet, floated to the blind hole area, and attached to the samples. However, it was unlikely that any of the seed heads could have fallen off the uncut millet. Accordingly, based on the testimony regarding the collection of the millet samples, we find that the mature seeds came from the seed heads of the cut millet.

8. According to Raines, such a seed is referred to as a "blasted" seed. A "blasted" seed is a seed that, due to its immaturity, has nothing inside of it, *i.e.*, it has not fully developed yet.

with this fact, Vogel reached into the water, grabbed some millet, squeezed the seed heads, and acknowledged that hard seeds were present. Finally, expert witness Dennis Thornburg—a regional wildlife biologist with the Illinois Department of Conservation—testified that if an area contained seed heads with hard seeds, that area could potentially attract ducks.

■ The evidence is compelling. The Court finds that the areas in front of the 6 o'clock and 9 o'clock blind holes were littered with cut millet with seed heads which contained hard—mature—seeds.[9] Such a situation clearly serves as an attractant or lure for ducks.

### III. Conclusion

Based on our findings and conclusions herein, the Court finds all Defendants guilty beyond a reasonable doubt of taking or attempting to take migratory birds over a "baited area" in violation of The Migratory Bird Treaty Act.

---

9. There was apparently a dispute amongst the law enforcement officials as to whether the area in front of the 3 o'clock blind was "baited." For purposes of this order, we will assume that area was not "baited." However, that does not relieve the individuals present in the 3 o'clock blind from liability. The "zone of influence" or "biological response of waterfowl" extends the "baited area" from the immediate areas where bait is capable of luring ducks to the adjacent areas where bait is being lured to the hunter's shooting location. *See Chandler,* 753 F.2d at 363; *Dize,* 839 F.Supp. at 1179. Here, the 3 o'clock blind was within 200 yards of the 6 o'clock blind, which of course was a "baited area." Due to the close proximity of the 6 o'clock and 3 o'clock blinds, we find that the hunters in the 3 o'clock blind were hunting over a "baited area," although the area in front of that blind was not "baited." Defendants offered no argument otherwise and thus conceded the issue.