**UNITED STATES of America,**

v.

**Samuel James MARSTON, Jr. and Samuel James Marston, IV.**

**No. CR. 01–00044.**

United States District Court,
S.D. Alabama,
Southern Division.

Oct. 16, 2001.

Richard D. Horne, Mobile, AL, for Samuel James Marston, Jr.

Richard H. Loftin, U.S. Attorney's Office, Mobile, AL, for U.S.

### *MEMORANDUM OPINION AND ORDER*

CASSADY, United States Magistrate Judge.

These misdemeanor dove hunting cases came on for a bench trial before the undersigned on July 10, 2001, following a waiver of the defendants' right to trial by a district judge pursuant to 18 U.S.C. § 3401(b). *See United States v. Chavez,* 204 F.3d 1305, 1317 (11th Cir.2000) ("[W]e find that Chavez was not entitled to a jury trial because the offense with which he was charged is presumptively petty and its additional penalties are not so serious that they reflect Congress' determination that the offense is severe.").[1] Following a com-

---

**1.** The Court finds the holding in *Chavez* equal-   ly applicable in this case.

prehensive consideration of the testimony, as well as the arguments of counsel on July 10 and 11, 2001, the Court finds that the defendants are **NOT GUILTY** of the Class B misdemeanors charged in the superceding information.

## FINDINGS OF FACT

1. Defendant Samuel James Marston, Jr. (hereinafter "Sam Marston") has been in the real estate and cattle business for twenty-five (25) years and for the last (approximately) sixteen (16) years has leased a two-hundred-acre piece of property right off Interstate 10 near the truck stop at Grand Bay, Mobile County, Alabama. Sam Marston and his son, Samuel James Marston, IV (hereinafter "Pete Marston"), have raised cattle on that leased property for sixteen years.

2. A ten acre portion of the leased property is an old "borrow" or dirt pit which, sixteen years ago, the Marstons cleaned up and planted in an effort to stabilize the soil and prevent erosion problems. That portion is planted, each year, during the latter portion of September or the first portion of October for grazing of winter cattle and again sometime in the Spring for grazing of summer cattle. Cattle are allowed access to this portion of the property about eight to nine months out of the year.

3. For years, the Marstons have hunted on that piece of property. In fact, in any given year, sixty (60) to ninety (90) days are devoted to dove hunting over that piece of property.

4. On June 29, 2000, Sam Marston and his son attended a seminar on dove hunting regulations sponsored by the Alabama Wildlife Federation and the Mobile County Wildlife and Conservation Association ADCNR, Division of Wildlife and Freshwater Fisheries. (*See* Government's Exhibit 7 ("Straight Talk for Dove Hunting Enthusiasts")) Oral presentations were made by a number of individuals, including Auburn University professor Dr. Lee Stribling, and written material was made available to seminar attendees. One of the written items made available to those attending the seminar was the amended version of Alabama Regulation 220–2–.114, Normal Agricultural Planting and Hunting of Dove, signed by the Commissioner of the Alabama Department of Conservation and Natural Resources, James D. Martin, on July 21, 1998. (*Compare id. with* Government's Exhibit 8)

Top sowing of all small grain without covering seed is not a recommended agricultural practice. Most small grain is normally planted into prepared seed beds by broadcasting or drilling. To be consistent with normal agricultural practice, a bona fide attempt should be made to cover seed by *cultipacking,* disking, raking, etc. Some incidental seed may remain on the surface following a bona fide covering attempt. The only recommended methods of planting small grain without a prepared seed bed are: (1) no-till drilling or (2) aerial seeding small grains into standing row crops, such as cotton or soybeans, just prior to defoliation. Recommended seeding rate for small grain is no more than 200 lbs./acre; seeds should be uniformly distributed (approximately 50 seeds, square ft.).

Except as otherwise provided above for no-till drilling or aerial seeding, and except for small grain planted and immediately covered in accordance with normal agricultural planting practice, it shall be unlawful to hunt dove on, over, or near any planted area where a bona fide attempt to cover small grain seed as described above has not been accomplished more than ten days prior to such hunting.

(Government's Exhibit 8). Another document available for seminar attendees was entitled "Dove Hunting and Baiting" published by the United States Fish and Wildlife Service, Office of Law Enforcement. (*See* Government's Exhibit 7) This document, which set forth relevant federal regulations and the general "dos and don'ts" of dove hunting and baiting, reads in relevant part as follows:

> Mourning doves and other migratory birds are a national resource protected under the Migratory Bird Treaty Act. The mourning dove is the most hunted migratory game bird in North America, and dove hunting is a popular sport in many parts of this country. Federal and State regulations help ensure that these birds continue to thrive while providing hunting opportunities.

> Regulatory changes adopted by the Federal government in 1999 define key terms for hunters and landowners with respect to baiting, and clarify conditions under which you can hunt doves and other migratory game birds. The goal of these rules is not to regulate farming, but to ensure that you understand those practices that are compatible with dove hunting and those that are not.

> .      .      .      .      .

> **Definitions from Title 50, Code of Federal Regulations, Part 20.11**

> *Normal agricultural planting, harvesting, or post-harvest manipulation* means a planting or harvesting undertaken for the purpose of producing and gathering a crop, or manipulation after such harvest and removal of grain, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative State Research, Education, and Extension Service of the U.S. Department of Agriculture.

> *Normal agricultural operation* means a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative State Research, Education, and Extension Service of the U.S. Department of Agriculture.

> *Normal soil stabilization practice* means a planting for agricultural soil erosion control or post-mining land reclamation conducted in accordance with official recommendations of State Extension Specialists of the Cooperative State Research, Education, and Extension Service of the U.S. Department of Agriculture for agricultural soil erosion control.

> *Baited area* means any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them. Any such area will remain a baited area for 10 days following the complete removal of all such salt, grain, or other feed.

> *Baiting* means the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them.

> *Manipulation* means the alteration of natural vegetation or agricultural crops by activities that include but are not limited to mowing, shredding, discing, rolling, chopping, trampling, flattening, burning, or herbicide treatments. The term manipulation does not include the distributing or scattering of grain, seed, or other feed after removal from or storage on the field where grown.

*Natural vegetation* means any non-agricultural, native, or naturalized plant species that grows at a site in response to planting or from existing seeds or other propagules. The term natural vegetation does not include planted millet. However, planted millet that grows on its own in subsequent years after the year of planting is considered natural vegetation.

**Excerpts from Title 50, Code of Federal Regulations, Part 20.21(i)**

No persons shall take migratory game birds:

(i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:

(1) The taking of any migratory game bird, including waterfowl, coots, and cranes, on or over the following lands or areas that are not otherwise baited areas -

(i) Standing crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice;

(ii) From a blind or other place of concealment camouflaged with natural vegetation;

(iii) From a blind or other place of concealment camouflaged with vegetation from agricultural crops, as long as such camouflaging does not result in the exposing, depositing, distributing or scattering of grain or other feed; or

(iv) Standing or flooded standing agricultural crops where grain is inadvertently scattered solely as a result of a hunter entering or exiting a hunting area, placing decoys, or retrieving downed birds.

(2) The taking of any migratory game bird, except waterfowl, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the result of a normal agricultural operation.

**What This Means**

You cannot hunt doves or any other migratory game bird by the aid of baiting or on or over any baited area where you know or reasonably should know that the area is or has been baited. Baiting is the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could lure or attract migratory game birds to, on, or over any areas where hunters are attempting to take them. A baited area is any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or feed could serve as a lure or attraction for migratory game birds.

**The 10–Day Rule and Distance**

The 10–day rule recognizes that removing bait does not remove the lure created, and that doves will habitually still be attracted to the same area even after the bait is gone. A baited area remains off limits to hunting for 10 days after all salt, grain, or other feed has been completely removed.

**What is Legal?**

You can hunt doves on, over, or from:

• Lands or areas where seeds or grains have been scattered solely as the result of normal agricultural operations, which include normal agricultural harvestings, normal agricultural post-harvest manip-

ulations, or normal agricultural practices.

• Lands planted by means of top-sowing or aerial seeding where seeds have been scattered solely as the result of a normal agricultural planting, a planting for agricultural soil erosion control, or a planting for post-mining land reclamation.

• Lands or areas where grain or feed has been distributed or scattered solely as the result of the manipulation of an agricultural crop or other feed on the land where grown.

• Standing crops.

• Lands planted as wildlife food plots, provided the seed is planted in a manner consistent with U.S. Department of Agriculture (USDA) Cooperative State Research, Education, and Extension Service recommendations for the planting of wildlife food plots. In States without official USDA recommendations for the planting of food plots, the seed must be planted in accordance with USDA guidelines for producing a crop.

• Lands planted as pasture improvements or for the purpose of grazing livestock. (The Fish and Wildlife Service will not make a distinction between agricultural fields planted with the intent to gather a crop and those planted without such intent provided the planting is carried out in a manner consistent with official recommendations of USDA State Extension Specialists.)

• Standing or manipulated natural vegetation.

• A blind or other place of concealment camouflaged with natural vegetation.

• A blind or other place of concealment camouflaged with vegetation from agricultural crops, provided your use of such vegetation does not expose, deposit, distribute or scatter grain or other feed. You should be aware that seeds or grains from such vegetation could create a baited area.

## Dove Hunting on Agricultural Lands

Agricultural lands offer good dove hunting. You can hunt doves in fields where grain has been distributed or scattered solely as the result of a normal agricultural operation. A normal agricultural operation includes normal agricultural plantings, harvestings, or post-harvest manipulations as well as other normal agricultural practices if they are conducted in accordance with official recommendations of USDA State Extension Specialists.

You can also hunt doves over lands planted by means of top sowing or aerial seeding where seeds have been scattered solely as the result of a normal agricultural planting or a normal soil stabilization practice.

## Planting and Harvesting

Planted seeds and grains that have not sprouted are very attractive to doves. Lands planted by means of top-sowing or aerial seeding can be hunted where seeds are present solely as the result of a normal agricultural planting or normal soil stabilization practice. A normal agricultural planting is a planting undertaken for the purpose of producing and gathering a crop. Normal plantings do not involve the placement of grain in piles or other concentrations. Plantings must follow official USDA recommendations. Relevant factors include recommended planting dates, proper seed distribution, seed bed preparation, application rate, and seed viability.

A normal soil stabilization practice is a planting for agricultural soil erosion control or post-mining land reclamation conducted in accordance with official recommendations of USDA State Extension Specialists.

The planting of wildlife food plots is considered a normal agricultural opera-

tion in many areas of the country. In many States, USDA State Extension Specialists provide official recommendations for the planting of wildlife food plots. Doves may be hunted over wildlife food plots planted in accordance with these recommendations. In those States where the Cooperative State Research, Education, and Extension Service does not issue official recommendations for the planting of wildlife food plots, doves may be hunted over these plots where seed has been planted in a manner consistent with the guidelines for producing a crop. However, seeds freshly planted or otherwise distributed for the purpose of luring, attracting, or enticing doves within gun range will be considered baiting.

The harvest of grain crops, such as corn, wheat, milo, sorghum, millet, sunflower, and buckwheat, also attracts doves. You can hunt doves that gather in such fields as long as any grain on the ground is present solely as the result of a normal agricultural harvest. You can also hunt doves over a field that has been manipulated after a normal harvest and removal of grain (i.e., post-harvest manipulation).

**Other Agricultural Practices**

Agricultural activities other than planting or harvesting also scatter grain or other feed in agricultural areas. You can hunt doves in such areas provided the agricultural practice involved is a normal agricultural practice (i.e., one that produces livestock or a crop) and follows official recommendations of USDA State Extension Specialists. Examples include "hogged down" fields (where livestock have been allowed to enter fields and feed on standing crops) and feedlots (small enclosed areas where farmers feed livestock to increase their weight). You cannot, however, hunt in an area where grain, salt, or other feed

has been placed to improve dove hunting.

**Pasture Lands**

Doves may be hunted over lands planted for the purpose of developing pasture as well as over lands planted for the purpose of pasture improvements. In both cases, the planting must be carried out in a manner consistent with official recommendations of USDA State Extension Specialists.

**Manipulation of Crops and Other Vegetation**

Agricultural crops, other feed, and natural vegetation may be manipulated to improve dove hunting. Manipulation means the alteration of natural vegetation or agricultural crops by activities such as mowing, shredding, discing, rolling, chopping, trampling, flattening, burning, or herbicide treatments. Manipulation does not include the distributing or scattering of seeds, grains, or other feed after removal from or storage on the field where grown. You should be aware that although you can hunt doves over manipulated agricultural crops, you cannot hunt waterfowl over manipulated agricultural crops except after the field has been subject to a normal harvest and removal of grain (i.e., post-harvest manipulation).

(*Id.* at 1–5)

5. Dr. Dean Stribling, who provided information on management of dove fields at the June 29, 2000 seminar, testified during the bench trial that his seminar presentation included dove biology (i.e., when doves breed and migrant versus resident doves), the best ways to attract and hold doves for the hunting season, feeding doves during the non-hunting season, and planting crops that you can shift off from to provide food for the doves to hold them in your field after feeding has to be stopped. His feeding recommendations were to feed starting as early as February or March, when the

first young are starting to come off, and feed until a point where all feed is gone ten days prior to the hunt. Following such feeding recommendations will essentially ensure the attraction of enough young doves for the entire hunting season. The crop planting he spoke of included the planting of corn, sunflower seeds, brown-top millet, grain sorghum, and wheat and his talk also included types of crop manipulation during hunting season, including bush-hogging, cutting down or burning the standing crop.

6. Dr. Stribling testified that all that is necessary for doves to feed is a clean area, whether its been burned off, disced off, or just naturally clean and devoid of plants for some reason, because doves have short legs and are unable to scratch like a lot of other birds.

7. Sam Marston testified that in the "borrow" or dirt pit on the leased property he and his son alternated rows of sunflower and brown-top millet with disced/disked strips[2]. (*See* Defendants' Exhibit 24, Wildlife Plantings and Practices, Circular ANR–485, Alabama Cooperative Extension System, Alabama A & M and Auburn Universities ("When planting in rows or with a drill, alternate the planted and bare areas. During the shooting period, bare areas should be disked or plowed. When broadcast planting, disc the strips before the season begins.... Plants which may be used in dove fields include an annual game-bird mixture, corn, corn and soybean mixture, brown-top millet, proso millet ..., brown-top millet and grain sorghum mixture, and the various peas, sesame and sorghum-soybean-millet mixtures.")) The

Marstons planted the sunflowers around June 1, 2000 and the brown-top millet was planted around July 4, 2000. (*See* Defendants' Exhibit 24 (the planting dates for forage-type millet run from April 1 through July 15)) The sunflowers and millet were planted for the specific purpose of attracting wildlife. Moreover, the strips between the sunflower and millet rows were disced and wheat seed was placed on top to attract and feed doves prior to the opening of hunting season.

8. The Marstons disced the "wheat seed" strips the week before the first week of September, 2000 to allow time for all the seed to be gone.

9. On October 2, 2000, State Game Warden Tony Dean,[3] during a fly-over of the area, located what appeared to be a field prepared for dove hunting. The Court finds, because no testimony was given to the contrary, that Dean perceived that this piece of property was prepared for dove hunting given the manner in which the field was laid out with alternating rows of sunflowers and/or millet with disced strips of land and not because he saw wheat seed on the ground.

10. Sam Marston went out to the dirt pit in a pickup truck, with attached garden seeder, on October 3, 2000 and spread wheat seed[4] in preparation for planting the winter cattle crop. (*See* Defendants' Exhibit 24 (recommended planting dates for wheat seed in South Alabama are September 15 through November 15); Government's Exhibit 9 (planting dates for wheat seed for grazing in South Alabama are from October 1 through November 15))[5] Marston went to a nearby farm, Wal-

---

2. The disced strips were each approximately twenty (20) feet in width and eighty (80) to one hundred (100) yards in length.

3. Dean is a conservation enforcement officer with the State of Alabama.

4. Dean testified that the method of spreading seed is inconsequential. He also admitted that a spreader may slosh out seed upon hitting a bump or root.

5. Huggins confirmed that October would fall within the planting dates for wheat.

ton's Farm, to retrieve his cultipacker[6] in order to cultipack the strips but the arms of the piece of equipment broke as he was loading it onto his lowboy.

11. Tony Dean requested Special Agent Darwin Huggins[7] to assist him in documenting and observing the field and to that end, Huggins dropped Dean off near the field on October 4, 2000 and the state game warden walked into the field from a nearby street. Dean observed a five to seven acre area of land[8] that had some planted sunflower and sprouted wheat as well as some disced strips with wheat seed laying on top of them but not tilled into the ground.[9] The seed was yellow, indicative of its freshness and recent application.[10] Dean took several photographs of the whole field (see Government's Exhibits 2A–2P), all of which show sprouted wheat[11] and concentrations of wheat seed on the disced strips primarily on top of vehicle or tractor tire tracks (see id.).[12] Dean testified that it "appears" from some of the photos that there was no established seed bed. (See Government's Exhibits 2A, 2E & 2N (Dean specifically testified that it does not appear from these photos that there is any established seed bed)) He admitted, however, that discing is a method for preparation of a seed bed and there is no regulation that says a prepared seed bed must be disced the day before the seed is planted. Josh Elmore testified, moreover, that it is common to see seed bed preparation that might have lumps or shallow parts or ridges.

12. On the same day that Dean took photos of the Marstons' leased "borrow"/dirt pit, Sam Marston called someone to fix his cultipacker. Marston picked up his repaired cultipacker (see Defendants' Exhibits 2–5 (photographs of the repaired cultipacker)) on Thursday, October 5, 2000, at 10:00 a.m., and cultipacked the dirt strips where the wheat seed was spread October 2, 2000. Marston explained that he did not use a disk to cover up the seed because a disk would put the seed three or four inches into the sandy soil where it

---

**6.** A cultipacker operates by using its weight (in belts or wheels) to push the seed into the ground and compact the soil to keep the moisture in the soil. A cultipacker will break up clods and some have chisel blades or teeth on them that make indentations in the ground.

**7.** Huggins is a special agent with the United States Fish and Wildlife Service.

**8.** That field is actually ten acres according to Sam Marston.

**9.** A number of mourning doves flew up off the field as Dean approached on foot.

**10.** Dean took a physical sample of the wheat. (Government's Exhibit 1) As well, he picked up some of the wheat and crunched it in his teeth; it was real crunchy and fresh.

**11.** Dean testified that it would not be unusual for wheat spread during the summer and disced under in September to sprout.

**12.** Dean testified that the recommendation for seed per acre is anywhere from 100 to 200

pounds but was unable to quote the recommendation per square foot and admitted that he did not put a grid down and count seed in any of the places he saw wheat. Government's Exhibit 10 provides, in relevant part, as follows:

> Top sowing of all small grain without covering seed is not recommended. Most small grain is normally planted into prepared seed beds by broadcasting or drilling. A bona fide attempt should be made to cover seed by disking, raking, etc. Some incidental seed may remain on the surface following a bona fide covering attempt. The only recommended methods of planting small grain without a prepared seed bed are 1) no-till drilling or 2) aerial seeding small grains into standing row crops, such as cotton or soybeans, just prior to defoliation. Recommended seeding rate for small grain is no more than 200 lbs/acre; seeds should be uniformly distributed (approximately 50 seeds/ft).

(*Id.*)

would never come up whereas a cultipacker will put the seed about one inch under ground and seal the moisture.

13. No federal or state agent/game warden returned to the field between October 4, 2000 and October 7, 2000. On Friday night October 6, 2000 there was significant rainfall in the area.[13]

14. On the morning of October 7, 2000, Sam Marston went to the dove field and perceived that the heavy rainfall had washed away evidence of the earlier cultipacking and therefore, cultipacked the field a second time in three days that morning.

15. On the afternoon of October 7, 2000 (between 2:30 and 3:30 p.m.), state and federal game wardens drove to the dove field. On the drive over, Huggins informed the other officers, like James Postman, Jr., that a determination had been made that the field was baited and their assistance was needed to check guns, plugs, migratory stamps, etc. Huggins dropped off Dean so he could walk in and observe the field. Dean saw several hunters scattered around the field shooting at mourning doves flying overhead. Dean took a videotape of what he observed of the hunt as he approached the field on foot and while crawling on his belly. (*See* Government's Exhibit 3)[14] Huggins testified that seven hunters, including Sam and Pete Marston, were actively taking part in the dove hunt. Dean's videotape, as well as some photographs taken by Huggins (*see* Government's Exhibits 4A–4N), reveal evidence that a cultipacker had been run across the soil since Dean's last visit (the exact testimony given by Dean) and some concentrations of wheat seed on top of the

soil. While Dean testified that the pictures and videotape show that the cultipacker had been pulled over only portions of some of the strips, those pieces of evidence appear to the Court to demonstrate that a cultipacker was pulled over the entire length of all the strips.[15] Huggins did testify, and the evidence appears to support, that there were areas of the disced strips that were smooth and the cutipacker had done a good job but that there were other areas of the strips, like near a tree snag, that were not smooth and, as a result, the cultipacker did not do a good job of covering the seed but instead left wheat seed exposed on top of the soil. (*See, e.g.,* Government's Exhibits 4E & 4L–4N (photographs reveal large concentrations of seed in a furrow where the seed had runoff during the heavy rainfall and in areas where the ground was not level and/or there existed a snag in the field))

16. It is clear from the testimony of all witnesses present for the dove hunt on October 7, 2000, including hunters Tim Holladay, John Leacy, and Josh Elmore, that Sam and Pete Marston hosted the hunt. Elmore, a county extension agent with the Alabama Cooperative Extension Services, testified that he killed several mourning doves and saw both Marstons shooting at doves and felt like they probably killed some of the birds since they are good shots. Elmore testified that when small grain is top sown on a prepared seed bed it is supposed to be immediately covered in order to qualify as a recommended agricultural practice. Elmore also testified that a prepared seed bed exists where you can go in and disk up an area and have bare dirt and can get soil to seed contact

---

**13.** Huggins was in the vicinity of the Marstons' dove field on Friday night checking on another dove field but never went to the Marstons' field.

**14.** Dean did not see any cattle on the dove field, on either October 4 or 7, 2000, but did observe cattle in adjacent fields.

**15.** The Court's perception of the photographs is consistent with Huggins' testimony.

thereby allowing the seed to germinate faster so that grazing will be possible by the first of December. A common method of seed bed preparation for small grains in Alabama is discing. In addition, a culti-packer is an appropriate device for covering and planting wheat seed. However, running a cultipacker over seed does not have as its aim the covering of all seed; rather, the main intent is to firm the seed bed, break clods of dirt and get soil to seed contact, whether that contact is achieved under the soil or on the surface of the soil. Elmore testified that the immediate coverage of small grain, including wheat seed, means "as quick as you can get to it" and depends upon the condition of the field/soil and normal agricultural delays, including mechanical breakdowns.

17. On the day of the hunt, Elmore walked two of the disced strips with Huggins. Elmore testified that these strips had been disced, seed spread, and then cultipacked. Some of the seed was uncovered but the seed he saw uncovered was at an angle where the cultipacker had been run at an angle and did not cover the seed.

18. Elmore testified that cattle could be turned out in the dove field at the end of deer season for limited grazing; that is, cattle could not be turned out on the field each and every day but a limited number could be allowed to occasionally graze that field. According to Elmore, cattle could be grazed on this plot of land from the Spring through to the Fall or approximately six to seven months. (*See* Defendants' Exhibits 6–14 (photographs taken of the field in March of 2001 showing the wheat that had been planted in the fall of 2000))

19. According to Sam Marston, on the day of the hunt, Officer Dean walked up and announced that the field was baited and that the hunters were hunting on or over a baited field. All the hunters were gathered together so that their licenses and guns could be checked (for serial num-bers, etc.). Officers had Marston's eighty-five-year-old father walk down the hill to the dirt pit so that they could get the serial number off his gun. At some point, Huggins told Sam Marston that he could ticket everyone for hunting over a baited field, to which Marston replied "If that's what you want to do that's fine." Later still, Marston left the group and walked back to his camp to watch a football game.

20. Huggins tape-recorded a telephone conversation between himself and Pete Marston on October 9, 2000. (*See* Government's Exhibit 6) During that telephone conversation, Pete Marston repeatedly told Huggins that he did not know when the wheat seed in the field was covered but that the seed was covered by cultipacking the strips. Pete Marston also commented that one reason for the delay in making an attempt to cover the wheat might have been because the batteries were not on his equipment.

21. In March of 2001, the Marstons were charged by information with knowingly and unlawfully taking mourning doves by aid of baiting, in violation of 16 U.S.C. §§ 704(b)(1) and 707(a), and "knowingly and unlawfully plac[ing] and direct[ing] the placement of bait on an area for the purpose of causing, inducing, and allowing a person to take and attempt to take ... mourning doves, by the aid of baiting, on and over the baited area[,]" in violation of 16 U.S.C. §§ 704(b)(2) & 707(c) and 18 U.S.C. § 2. (Doc. 1) On May 31, 2001, the information was superceded. (Doc. 15) In the superceding information, the Marstons were charged in Count I with knowingly and unlawfully taking mourning doves over a baited area, in violation of 16 U.S.C. §§ 704(b)(1) and 707(a), and in Count II with knowingly and unlawfully aiding and abetting five other persons in the taking of mourning doves over a baited area, in violation of 16 U.S.C. §§ 704(b)(1) & 707(a) and 18 U.S.C. § 2.

## CONCLUSIONS OF LAW

1. Section 704(b) of the Migratory Bird Treaty Act provides that it shall be unlawful for any person to:

(1) take any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area; or

(2) place or direct the placement of bait on or adjacent to an area for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over the baited area.

16 U.S.C. § 704(b).

2. Federal regulations promulgated under the Migratory Bird Treaty Act provide, in relevant part, as follows:

### § 20.1 Scope of regulations.

(a) *In general.* The regulations contained in this part relate only to the hunting of migratory game birds, and crows.

(b) *Procedural and substantive requirements.* Migratory game birds may be taken, possessed, transported, shipped, exported, or imported only in accordance with the restrictions, conditions, and requirements contained in this part.

### § 20.11 What terms do I need to understand?

For the purpose of this part, the following terms shall be construed, respectively, to mean and to include:

(a) *Migratory game birds* means those migratory birds included in the terms of conventions between the United States and any foreign country for the protection of migratory birds, for which open seasons are prescribed in this part and belong to the following families:

(1) Anatidae (ducks, geese [including brant] and swans);

(2) Columbidae (doves and pigeons);

(3) Gruidae (cranes);

(4) Rallidae (rails, coots and gallinules); and

(5) Scolopacidae (woodcock and snipe).

A list of migratory birds protected by the international conventions and the Migratory Bird Treaty Act appears in § 10.13 [16] of this subchapter.

.    .    .    .    .

(g) *Normal agricultural planting, harvesting, or post-harvest manipulation* means a planting or harvesting undertaken for the purpose of producing and gathering a crop, or manipulation after such harvest and removal of grain, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.

(h) *Normal agricultural operation* means a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture.

.    .    .    .    .

(j) *Baited area* means any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over

---

**16.** Mourning doves are included in the dove species of migratory birds. 50 C.F.R. § 10.13.

areas where hunters are attempting to take them. Any such area will remain a baited area for ten days following the complete removal of all such salt, grain, or other feed.

(k) *Baiting* means the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them.

. . . . .

### § 20.21 What hunting methods are illegal?

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No persons shall take migratory game birds:

. . . . .

(i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:

(1) the taking of any migratory game bird, including waterfowl, coots, and cranes, on or over the following lands or areas that are not otherwise baited areas-

(i) Standing crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice;

(ii) From a blind or other place of concealment camouflaged with natural vegetation;

(iii) From a blind or other place of concealment camouflaged with vegetation from agricultural crops, as long as such camouflaging does not result in the exposing, depositing, distributing or scattering of grain or other feed; or

(iv) Standing or flooded standing agricultural crops where grain is inadvertently scattered solely as a result of a hunter entering or exiting a hunting area, placing decoys, or retrieving downed birds.

(2) The taking of any migratory game bird, except waterfowl, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the result of a normal agricultural operation.

(*Id.* (footnote added); *see* 64 Fed.Reg. 29,-801 (1999) ("Whether agricultural plantings, harvestings, post-harvest manipulations, operations, or soil stabilization practices are 'normal' must be gauged against an objective standard. Therefore, this rule incorporates our policy to rely upon State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture (USDA) as the best source of factual and objective information on recommended planting, cultivation, harvest, and utilization of agricultural crops. These State Extension Specialists make recommendations about agricultural practices that may vary from state-to-state or region-to-region within a state. The recommendations may be site-specific, and may or may not be published. However, the Service will continue to make final determinations about whether the official recommendations were followed."))

3. In regard to the second exception delineated in § 20.21(i)(2) above, the Fifth Circuit Court of Appeals has held the following:

[T]he subjective intent of the person planting the field should be considered in light of the objective agricultural

norms used in the area. This standard introduces both subjective and objective elements into the inquiry. The Latin words "bona fide" included in the hunting regulations mean "in good faith" or "without fraud." Like the Sixth Circuit in *Brandt,* the subjective prong of the test we adopt is not a mens rea standard. It looks at the intent of the person scattering the grain, not the intent of the hunter. In other words, it does not incorporate a scienter requirement in addition to this circuit's *Delahoussaye* "should have known" standard; it simply recognizes that the language of the exception requires an inquiry into the intent of the planter to determine whether the activity in question was conducted pursuant to a "bona fide agricultural operation or procedure." ... We thus hold that part of the inquiry into whether an act is "bona fide" or not requires the government to prove that the spreader's intentions were not in good faith. Stated another way, the government must prove, "as in any other case where intent is an element of the offense," that the farmer's acts were merely a sham to attract migratory birds to hunt.

*United States v. Adams,* 174 F.3d 571, 576–577 & 577 (5th Cir.1999) (internal citations omitted); *see United States v. Santos–Riviera,* 183 F.3d 367, 372 (5th Cir. 1999) ("In *Adams,* we rejected the Government's argument that the two exceptions set forth in § 20.21(i)(1) and (2) for 'normal agricultural planting or harvesting' and 'bona fide agricultural operations or procedures' were affirmative defenses as opposed to elements of the crime itself. We held that '[t]he onus is therefore on the Government to prove that neither circumstance existed.' ").

4. Alabama regulation 220–2–.114 provides, in relevant part, that "[t]o be consistent with normal agricultural practice, a bona fide attempt should be made to cover seed by *cultipacking,* disking, raking, etc." and that "except for small grain planted and immediately covered in accordance with normal agricultural planting practice, it shall be unlawful to hunt dove on, over, or near any planted area where a bona fide attempt to cover small grain seed as described above has not been accomplished more than ten days prior to such hunting." (Government's Exhibit 8)

5. The Court in this instance concludes that the United States has failed to carry its burden of proving that the wheat seed was not scattered by the defendants solely as the result of a normal agricultural operation. Given no evidence to the contrary, it is clear that the wheat seed was spread by Sam Marston on Tuesday October 3, 2000, following discing of the "borrow" pit strips the week before the first week of September 2000. The discing of those strips constituted preparation of the seed bed. It is also clear, from Sam Marston's testimony, that the seed was spread in preparation for planting the winter cattle crop and that this defendant had every intention of cultipacking the seed on the afternoon of October 3, 2000 until his cultipacker broke. Sam Marston did cultipack the seed immediately upon receiving his repaired cultipacker on October 5, 2000. The Court finds that Sam Marston's actions on October 3 and 5, 2000 are consistent with normal agricultural practices and constitute an immediate bona fide attempt to cover wheat seed by cultipacking. While Pete Marston did indicate to Agent Huggins, in a taped telephone conversation on October 9, 2000, that one reason for the delay in covering the seed "might" have been a problem experienced with equipment batteries, as opposed to a broken cultipacker, the undersigned does not find this hypothetical-based conversation contradictory of Sam Marston's bench trial testimony particularly in light of Pete Marston's lack of appreciation for any actions taken by his father, as evidenced by

his numerous comments to Huggins that he did not know when the field was culti-packed.

6. Since the Government has failed to meet its burden to prove beyond a reasonable doubt that the dove field was baited, the Court concludes that the defendants' "wheat seed operation was performed in accordance with normal agricultural practice and did not constitute bait under the statute." *United States v. Lee*, 217 F.3d 284, 287 (5th Cir.2000); *see United States v. Traxler*, 847 F.Supp. 492, 495 (S.D.Miss. 1994) ("Had the field only contained wheat, the issue would have been closed. Defendants showed that they prepared parts of the field for winter grazing by disking it, sowing wheat, rye grass and clover and spreading lime and fertilizer. They also proved that they had used the field in late 1992 for cattle grazing. Had the entire field been so prepared the field would have qualified under the exception allowing hunting 'over any lands where . . . wheat or other grain . . . has been distributed or scattered as the result of bona fide agricultural operations or procedures . . . .' 50 C.F.R. § 20.21(i).").

### CONCLUSION

The Court finds the defendants, Samuel James Marston, Jr. and Samuel James Marston, IV, **NOT GUILTY** of knowingly and unlawfully taking mourning doves over a baited area, as charged in Count I of the superceding information, and **NOT GUILTY** of knowingly and unlawfully aiding and abetting five other persons in the taking of mourning doves over a baited area, as charged in Count II of the superceding information.

### JUDGMENT

In accordance with the memorandum opinion and order entered on this date, it is hereby **ORDERED, ADJUDGED, and DECREED** that the defendants, Samuel James Marston, Jr. and Samuel James

Marston, IV, are **NOT GUILTY** of knowingly and unlawfully taking mourning doves over a baited area, as charged in Count I of the superceding information, and **NOT GUILTY** of knowingly and unlawfully aiding and abetting five other persons in the taking of mourning doves over a baited area, as charged in Count II of the superceding information.