**UNITED STATES of America Plaintiff**

v.

**Jack STRASSWEG, Rick Krohn, Clifford Romain Defendants**

No. 4:03 CR–37–ERG.

United States District Court,
W.D. Kentucky,
At Owensboro.

Aug. 18, 2004.

James H. Barr, III, U.S. Attorney Office, Louisville, KY, for Plaintiffs.

Richard D. Horne, Horne & Dailey, LLC, Mobile, AL, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

GOEBEL, United States Magistrate Judge.

### BACKGROUND

This Class B misdemeanor dove hunting case came before the undersigned United States Magistrate Judge for a bench trial on February 23, 2004, following a waiver of each defendant's right to trial by a district judge pursuant to 18 U.S.C. § 3401(b) (DN 36–38, 39, 40). Essentially, the Superseding Information charges that on or about September 1, 2002, defendants Jack Strassweg ("Strassweg") and Rick Krohn ("Krohn") were hunting migratory birds (doves) over what they knew or should have known was a baited area, in violation of the Migratory Bird Treaty Act, and that defendant Clifford Romain ("Romain") aided and abetted them in committing the offense. 18 U.S.C. § 2, 16 U.S.C. §§ 703, 704(b)(1), and 707(a) (DN 26).

James H. Barr, III, Assistant United States Attorney, and Randy Ream, Assistant United States Attorney appeared on behalf of the United States of America ("United States"); Defendants Strassweg, Krohn, and Romain appeared with their retained counsel, Richard D. Home and W. Mitchell Deep.

During the bench trial, the United States presented several exhibits as well as testimony from Officers Marcus Bowling, David Kuhn, Ronnie Rich, Greg Noel and Clark Boggs with the Kentucky Department of Fish and Wildlife Resources; Morris Bitzer, Ph.D., an agronomist with the University of Kentucky and former state extension specialist; and Gene Moore a Special Agent with the United States Department of Fish and Wildlife Service, Division of Law Enforcement. The defendants presented several exhibits and testimony from defendant Strassweg and H. Lee Stribling, Ph.D., an associate professor, Zoology and Wildlife Science, Auburn University.

In the weeks following trial, the undersigned granted defendants leave to supplement the record with Exhibits 35, 36, and 37 (DN 44, 46, 49, 50, 52, 53). The undersigned also granted defendants leave to supplement the record with Exhibit 38 which is a redacted version of Special Agent Gene Moore's memorandum memorializing his interview of Mr. Romain on November 6, 2002 (DN 56, 57, 58, 59).

Pursuant to an order by the undersigned (DN 40), the parties filed simultaneous post-trial briefs (DN 42, 43) and rebuttal briefs (DN 47, 48). Additionally, defendants filed a motion for judgment of acquittal (DN 45).

The undersigned has conducted a comprehensive review of the evidence presented at trial and the arguments made by counsel. The undersigned finds that each defendant is GUILTY of the Class B misdemeanor as charged in the Superseding Information.

### FINDINGS OF FACT

By way of background, Strassweg, Krohn and Romain each have a one-third interest in High Ground L.L.C. ("High Ground"), a private hunting club and wildlife refuge located in Henderson County, Kentucky. High Ground started out with the purchase of a 320 acre farm and over the next four and one-half years grew to a

total of 1600 acres with an additional 350 acres of leased ground. According to Mr. Strassweg the money generated from annual membership fees and day hunting fees is used to pay expenses and make wildlife improvements to the facility.

Referring to the Government's aerial photograph [1] (Government's Exhibit 2–3), Highway 136 runs along the western edge of Field 1 and Field 2. Field 2 is the northernmost field and is separated from Field 1 by a dirt access road that runs east from Highway 136 until it ends at a "T" intersection with a second dirt road (Government's Exhibit 2–3). The dirt access road will be referred to as the entrance road. The second dirt road runs in a north/south direction along the eastern borders of Field 1 and Field 2 (Government's Exhibit 2–3). The second dirt road will be referred to as the "Oil Road." [2] During the course of trial the parties presented testimonial and demonstrative evidence regarding the conditions that existed on Field 1, Field 2, and the Oil Road, all of which are on High Ground's property.

In the late night hours of Friday, August 30, 2002, Officers Marcus Bowling, David Kuhn, and Ronnie Rich with the Kentucky Department of Fish and Wildlife Resources ("Fish & Wildlife)", investigated a tip about a baited field at High Ground. With flashlight in hand, Officer Rich inspected both fields and the Oil Road. At the time of the inspection both fields had alternating strips of vegetation and seeded bare ground.

Officer Rich designated one seed sample site on the Oil Road and three seed sample sites in Field 2 where he found high concentrations of seed on the ground.[3] Although Officer Rich noted other concentrations of seed in Field 2, the highest concentrations of seed were located in the two strips where the sample sites are located. Officer Rich did not find any high concentrations of seed in Field 1. The locations of the seed sample sites are depicted on one of the Government's aerial photographs (Government's Exhibit 2–3). Officer Bowling video taped [4] (Government's Exhibit 3) and Officer Kuhn photographed the seed sampling process (Government's Collective Exhibit 5). A few hours after they departed, in the early morning hours of August 31, Officers Bowling and Kuhn returned and took fresh seed samples from a spot on the Oil Road (1–b) and a spot in Field 2(4–b) because Officer Bowling discovered the original samples accidentally got mixed together. The seed samples are marked Government's Exhibits 4–1b, 4–2, 4–3, 4–4b.[5] Officer Bowling recalled that at the time the seed samples were taken from the Oil Road and bare strips in Field 2 the dirt was hard packed.

Dove season opened on the following Sunday, September 1, 2002, at 11:00 a.m.

---

1. The border of Government's Exhibit 2–3 has been marked to show the points of the compass.

2. Mr. Strassweg's testimony indicates before High Ground existed the Oil Road was cut to allow access to oil wells.

3. Officer Rich inspected Field 1 by walking East from Highway 136 to the Oil Road in a wide zig zag path. Officer Rich then walked the Oil Road in a northerly direction until he reached Field 2. Officer Rich selected one site on the Oil Road where he observed a high concentration of seed. He inspected Field 2 by walking west toward Highway 136 in a wide zig zag path.

4. The undersigned sustained defendants' evidentiary objection to the audio portion of the video tape. Therefore, the audio portion of the video tape has not been considered in making the factual findings set forth within this document.

5. Officer Bowling testified that in accordance with evidence collection procedures, each seed sample was taken from a uniform one square foot area.

On that Sunday morning, at approximately 10:00 to 10:30 a.m., Officers Rich, Bowling, Kuhn, Greg Noel, and Captain Clark Boggs traveled to High Ground and began surveillance from the wooded key hole area just north of Field 2 (Government's Exhibit 2–3). Officer Rich made a video tape of what he saw prior to and after the 11:00 a.m. start of the hunting season (Government's Exhibit 6). When they arrived, the officers observed a tractor discing parts of Field 2. They also noted that the seed sample sites in Field 2 had been disced. After the 11:00 a.m. start of dove season, officers observed several hunters actively taking part in the dove hunt in and around Field 2 and the Oil Road.

The officers observed the dove hunt for a period of time before they approached the hunters. Officer Kuhn spoke with Mr. Krohn. His hunting site was in the area where the southeast corner of Field 2 and the Oil Road meet. Mr. Krohn possessed a loaded shotgun and eight doves.

Officer Rich spoke with Mr. Eakins and his twelve-year-old daughter. Their hunting site was in the area near the telephone pole in Field 2.

Officer Noel spoke with Mr. Strassweg. His hunting site was on the Oil Road near the northeast corner of Field 2. When Officer Noel spoke with Mr. Strassweg he observed Mr. Strassweg with a shotgun and two doves.

Captain Boggs also spoke with Messrs. Strassweg and Krohn. He noted seed on the Oil Road next to Field 1. Captain Boggs commented that it looked like the road had been sown. He also noted a spot on the Oil Road where it looked like a dip had jarred the spreader causing it to spill wheat seed.

The Government's expert witness, Morris Bitzer, is employed by the University of Kentucky as a research specialist in agronomy and grain crops. For approximately thirty years he was employed by the United States Department of Agriculture as a State Extension/Grain Crop Specialist. His duties as a State Extension/Grain Crop Specialist included making planting recommendations.

Mr. Bitzer co-edited and co-authored a University of Kentucky, College of Agriculture, publication entitled "Wheat Management in Kentucky" (Government's Exhibit 8). This publication makes a fall wheat planting recommendation. County extension agents distributed the publication to farmers throughout the state. Mr. Bitzer co-authored an article entitled "Seeding Cover Crops in Kentucky," that ran in a University of Kentucky Department of Agronomy news letter (Government's Exhibit 7). This article also makes a fall wheat planting recommendation.

Mr. Bitzer testified that wheat is the most commonly used cover crop in Kentucky. It is primarily planted in the fall to prevent erosion. In Henderson County, where High Ground is located, the written recommendation for planting a cover crop of wheat is October 1–15 with a seed count of 40 to 45 seeds per square foot. Generally, planting earlier in the season or a higher seed count is not recommended because of an increased chance of disease, problems with aphids, and winter/spring freeze injury to the crop. However, there are exceptions. For example, if wheat seed is being planted for livestock grazing then it should be planted in mid to late September and the seed count per square foot should be a little bit higher, perhaps fifty seeds per square foot, in order to give more forage to the livestock. Additionally, it is appropriate to plant a cover crop of wheat as early as mid-August to prevent soil erosion following a tobacco harvest.[6]

---

6. On cross-examination Mr. Bitzer agreed he made such a recommendation in his article

Mr. Bitzer opined that seed sample 4b (Government's Exhibit 4–4b) with 3,508 seeds per square foot and seed sample 3 (Government's Exhibit 4–3) with 1,340 seeds per square foot far exceed any normal agricultural practice. He opined that seed rates this high would occur if seed was dropping straight to the ground from the hopper of a broken spreader.

On cross-examination, Mr. Bitzer conceded that the official recommendations from the Extension Service are intended to maximize wheat crop production and they may not be appropriate for wildlife management, an area in which he lacks expertise. Despite his admitted lack of expertise, Mr. Bitzer conceded it would be an acceptable practice for a wildlife manager to plant a cover crop of wheat in mid-August in order to have vegetative cover to attract deer by the start of bow hunting season on September 15th. Mr. Bitzer agreed that seed spreaders do break and cause spillage. He also agreed that when a tractor makes a turn at the end of a row the spreader might cast seed onto a neighboring road. Mr. Bitzer acknowledged that farmers generally would not take the time to clean the seed off the road.

Gene Moore is a Special Agent with the United States Fish and Wildlife Services, Division of Law Enforcement. He has attended the Federal Bureau of Investigation National Academy, the Federal Law Enforcement Training Center, and the Kentucky Law Enforcement Training Center. He deals with the migratory bird treaties almost daily in the course of his employment as a Special Agent.

Mr. Moore counted the seeds in Sample 4–2 and found a total of 2,131 wheat seeds plus 4 whole kernels of corn. He counted the seeds in Exhibit 4–3 and found a total of 1,340 wheat seeds plus 2 whole kernels of corn. He counted the seeds in Sample 4–1b and found a total of 51 wheat seeds. Mr. Moore testified that Officers Bolling and Kuhn had counted a total of 1,200 wheat seeds in Exhibit 4–4b before they stopped counting. Mr. Moore counted an additional 2,308 seeds in Exhibit 4–4b. The combined seed counts in Exhibit 4–4b are 3,508 seeds.

Agent Moore testified that he interviewed Mr. Romain on November 6, 2002. During the interview Mr. Romain indicated that during the five to seven days preceding the opening day of dove season wheat seed was spread and disced almost daily in an effort to attract doves to the field.[7] However, Agent Moore agreed the nighttime photographs taken on August 30 and 31 (Government Exhibit 5) do not show Field 2 had been recently disced. Agent Moore recalled that Mr. Romain reported the last day seed was applied to both fields was Thursday August 29th or Friday August 30th. Mr. Romain insisted that a problem with the seed casting wheel on the spreader caused too much seed to pour onto the ground in part of Field 2.[8]

for Soil Science News and Views.

7. Agent Moore interviewed Mr. Romain and then prepared a summary of the interview (Defendants' Exhibit 38). The memorandum of interview does not mention repeat applications of wheat seed followed by discing during the week preceding opening day of dove season (Defendants' Exhibit 38). It does mention wheat was sowed one week prior to opening day and that Thursday August 29th or Friday August 30th was the last time wheat was applied (Defendants' Exhibit 38). The memorandum of interview also indicates

Field 2 was "disced under several times during the week of the hunt, almost daily" (Defendants' Exhibit 38). In response to a question by the Court, Agent Moore explained although he did not mention it in his memorandum of interview he does recall Mr. Romain indicating that wheat was spread and then disced under nearly every day in the week leading up to opening day of dove season.

8. Agent Moore did not ask Mr. Romain whether the spreader had been fixed nor did he ask to look at the spreader. Agent Moore

Mr. Romain advised Agent Moore that a shovel had been used to try to clean up the excess seed. Mr. Romain also indicated that on Sunday morning, before the 11:00 a.m. start of the dove season, he disced Field 2 to turn the wheat seed under and create fresh soil for the birds.

Agent Moore opined that the defendants had two choices when they discovered excessive amounts of wheat seed in Field 2. The first choice was not hunt the field. The second choice was turn the wheat seed under by discing and then wait ten days before beginning to hunt the field.

On cross-examination, Agent Moore agreed that a June 22, 2000 letter from the Department of the Interior does indicate dove may be hunted over a wild life food plot planted in a manner consistent with the guidelines for production of a crop. However, he pointed out that the wheat seed in Field 2 was not spread in accordance with the recommended seed rates and time of year for production of a crop.

On November 6, 2002, Agent Moore prepared a memorandum of interview that summarized his meeting with Mr. Romain (Defendants' Exhibit 38). The memorandum indicates Mr. Romain reported that the last time wheat seed was applied to Field 2 was Thursday August 29th or Friday August 30th (Defendants' Exhibit 38). According to the memorandum of interview, Mr. Romain described a problem with the spreader wheel that caused wheat seed to be applied to the ground in piles (Defendants' Exhibit 38). It also indicates Mr. Romain reported an attempt to clean up the piles and that he claimed not to realize how much seed was on the field (Defendants' Exhibit 38). The memorandum of interview mentions Field 2 was disced under on the morning of the hunt and "several times during the week of the

hunt, almost daily" (Defendants' Exhibit 38).

Mr. Strassweg testified that Field 1 is planted in an east/west direction and Field 2 is planted in a north/south direction (See Government Exhibit 2–3). No later than May 15, 2002, both fields were disced and fertilized with lime. Then they alternated rows of sunflower and millet seed (approximately 90 feet wide) with bare strips (approximately 60 feet wide) across both fields. Mr. Strassweg believes there were as many as 20 bare strips on Field 2.

According to Mr. Strassweg, from May to early August they periodically re-disced the bare strips in each field because doves love dust. Additionally, from May to early August they periodically spread wheat, milo and millet seed in the bare strips to feed doves and other types of birds. On August 9th and 10th of 2002, the bare strips in Fields 1 and 2 were disced, top-seeded with winter wheat seed, and then cultipacked. They used an ATV to pull an eight-bushel planter with a cyclone wheel that distributed the wheat seed in a 30 foot wide path. Thus, they had to make two passes in order to seed the 60 foot width of each bare strip. Mr. Strassweg testified they planted the wheat seed in early August in order to have an established forage crop for the deer before the mid-September start of deer season.

Mr. Strassweg testified they were experiencing drought like conditions that August. For this reason, he and Messrs. Romain and Krohn inspected both fields on Wednesday August 14th. When they found no green coming up they decided to replant the fields. They returned on Saturday August 17th and again disced the 60 foot wide strips, top-seeded with winter wheat seed, and cultipacked both fields.

explained that based on his personal experience people always claim a broken spreader is the cause of a baited field and many times

they obtain a bill showing that their spreader was fixed after the fact.

Mr. Strassweg testified that the retainer pin to the cyclone wheel on the eight-bushel spreader broke while Mr. Krohn was pulling it behind the ATV in Field 2. According to Mr. Strassweg, the cyclone wheel then fell to the ground and a concentrated stream of wheat seed began to pour from the spreader hopper directly to the ground. Mr. Strassweg testified that Mr. Krohn was initially unaware of what happened and, as a result, a concentrated stream of wheat seed poured directly to the ground as Mr. Krohn drove the ATV part way up one side of a 60 foot wide bare strip (toward the entrance road), around the end of a 90 foot wide strip of sunflower and millet, and part way down another 60 foot wide bare strip (away from the entrance road). Mr. Strassweg believes Mr. Krohn drove the ATV as much as 600 feet before he discovered the problem with the spreader.[9] According to Mr. Strassweg, when Mr. Krohn became aware of the problem he stopped the ATV and pulled the lever to close the seed door on the spreader.

Mr. Strassweg testified that he and Messrs. Krohn and Romain inspected the spill on August 17th and they recognized that the amount of seed on the ground was way above a normal seeding rate. Mr. Strassweg acknowledged that they perceived the spill as a dove attraction problem given their plans to hunt the field on September 1.

After they fixed the spreader and finished spreading seed in Field 2, Mr. Romain attempted to disc the spilled seed into the ground using a 50 horsepower John Deere tractor with a 3 point disc. Mr. Strassweg believes that Mr. Romain went over the spill at least once but he may have gone over the spill two or three times because the ground was extremely hard, due to drought like conditions, and the limitations of their equipment. Mr.

Strassweg believes the Fish and Wildlife officers took seed samples from the area in Field 2 where the spill occurred.

Mr. Strassweg testified that seed spilled on the Oil Road when they turned the spreader around while seeding Field 1. He acknowledged they made no effort to clean up the seed and it was still on the Oil Road on the day of the hunt.

According to Mr. Strassweg, on the morning of September 1st both he and Mr. Romain were at High Ground. They both had seen an article in the Henderson newspaper about dove hunting and baiting. The article caused Mr. Strassweg to be concerned enough to ask Mr. Romain to disc the area of the seed spill. Mr. Strassweg did not inspect the spill area before he made his request. Mr. Romain completed discing the spill area shortly before the 11:00 o'clock start of the dove hunting season.

According to Mr. Strassweg, the Government's aerial photographs accurately depict the condition of the two fields in October 2002 (see e.g. Government's Exhibit 2–3). He believes the dark strips depicted in those aerial photographs are winter wheat and the lighter strips are the rows of millet and sunflower after they were bush hogged. Mr. Strassweg testified that defendants' aerial photographs were taken on September 5, 2002 (Exhibits 13a and 14a). He believes these aerial photographs more accurately depict the condition of the two fields on August 30th, August 31st, and September 1st of 2002.

Defendants called H. Lee Stribling, Ph. D., as their expert witness. Dr. Stribling is a certified wildlife biologist with degrees from North Carolina State University and Clemson University. For the past nineteen and a half years he has been a professor at Auburn University in the School of

9. Mr. Strassweg testified that each strip in Field 2 is approximately 800 feet long.

Forestry and Wildlife Science. Dr. Stribling has a seventy-five per cent extension appointment and a twenty-five per cent research appointment. Pursuant to the extension appointment, he is a wildlife extension specialist who produces wildlife management publications for the State of Alabama. Dr. Stribling also participates in seminars regarding numerous wildlife topics. Additionally, he teaches one or two graduate level classes every two years.

Referring to Defendants' Exhibit 8, which is a letter from the Director of the United States Department of Interior dated June 22, 2000, Dr. Stribling provided his interpretation of the third paragraph. In Dr. Stribling's opinion, the paragraph indicates dove may be hunted over a freshly planted wildlife food plot if the state's wildlife extension specialist has made recommendations for the planting of wildlife food plots and the planting complies with those recommendations. The paragraph also indicates, in Dr. Stribling's opinion, that if the state's wildlife extension specialist does not make recommendations for the planting of wildlife food plots then the planting must be consistent with the guidelines for production of a crop. Dr. Stribling pointed out that the paragraph does not indicate whether that crop is a cover crop, a forage crop for farm animals, or a seed crop.

As far as Dr. Stribling knows, the wildlife specialist in Kentucky, Dr. Tom Burns, has not made recommendations for the planting of wildlife food plots. Thus, explained Dr. Stribling, in Kentucky doves may be hunted over a wildlife food plot if the seed has been planted in a manner consistent with the recommendations that Mr. Bitzer made earlier in the day.

To attract and keep resident doves, Dr. Stribling recommends a wildlife food plot with alternating strips of crop (sunflower/millet) and bare ground. Throughout the winter, spring and summer, seed that doves like to eat, such as milo and wheat, should be spread on top of the bare soil in the clear strips because doves are very poor at scratching for seed. About April, the crop strips should be planted with sunflower and millet which will mature shortly before the dove season begins. Dr. Stribling explained that shortly before the dove season begins the spreading of dove feed in the clear strips must stop so that the doves have eaten up the seed at least ten days before the dove season begins. At this point, Dr. Stribling recommends running a bush hog through the standing crops of sunflower and millet to knock the crops down, shatter the seed heads, and spread the seeds over the ground. Dr. Stribling believes the regulations allow hunting over a field where the standing crops have been manipulated in this manner to attract the doves. He also opined that if seed is spread as part of a normal agricultural practice, such as planting forage for farm animals, then it is legal to hunt over the field even though the seed has been spread less than ten days before the dove season begins.

Finally, Dr. Stribling testified that spillage of seed during planting is a normal part of agricultural practice. Dr. Stribling opined that if accidental spillage results in seed counts that are higher than normal it is permissible to hunt doves over the field because there was no intent to bait the field.

### CONCLUSIONS OF LAW

The Superseding Information charges that on or about September 1, 2002, Messrs. Strassweg and Krohn, aided and abetted by Mr. Romain, did take, and attempt to take, migratory game birds (doves) on or over a baited area and knew and reasonably should have known that the area was a baited area, in violation of the Migratory Bird Treaty Act (DN 26). The Superseding Information alleges viola-

tions of 18 U.S.C. § 2, and 16 U.S.C. §§ 703, 704(b)(1) and 707(a) (DN 26).

There is no dispute that Messrs. Strassweg and Krohn hunted over Field 2 on September 1, 2002. Nor is there any dispute that the doves they hunted and killed on September 1, 2002 are "migratory game birds" protected by the Migratory Bird Treaty Act. 16 U.S.C. § 703; 50 C.F.R. § 20.11(a)(2). Thus, the undersigned must determine whether the United States has satisfied its burden as to the remaining elements of the charge against Messrs. Strassweg and Krohn. More specifically, has the United States proven beyond a reasonable doubt that Messrs. Strassweg and Krohn took the doves by the aid of baiting or on or over a baited area? 16 U.S.C. § 704(b)(1); 50 C.F.R. §§ 20.11(j) and (k); 20.21(i)(1)(i) and (2). Secondly, has the United States proven beyond a reasonable doubt that Messrs. Strassweg and Krohn knew or reasonably should have known that the area was a baited area? 16 U.S.C. § 704(b)(1); 50 C.F.R. §§ 20.21(i)(1)(1) and (2).

If the United States satisfies its burden as to the charge against Messrs. Strassweg and Krohn, then it has also satisfied the first element of the aiding and abetting charge against Mr. Romain.[10] *Sixth Circuit Instruction § 4.01, Sixth Circuit Pattern Criminal Jury Instructions* (1991). The undersigned then must determine whether the United States has satisfied its burden as to the remaining elements of the charge against Mr. Romain. More specifically, has the United States proven beyond a reasonable doubt that Mr. Romain helped Messrs. Strassweg and Krohn to commit the crime and that he intended to help them commit the crime. *Id.;* 18 U.S.C. § 2.[11]

The undersigned will now determine whether the United States has satisfied its burden as to the remaining elements of the charges against Messrs. Strassweg and Krohn.[12] Regardless of whether the wheat seed was spread on Field 2 as early as August 17th or as late as August 30th, the Government's evidence shows that it

---

**10.** To satisfy the first element of an aiding and abetting charge the United States must prove beyond a reasonable doubt that the underlying crime was committed. *Sixth Circuit Instruction § 4.01, Sixth Circuit Pattern Criminal Jury Instructions* (1991).

**11.** In relevant part, 18 U.S.C. § 2 reads as follows:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

**12.** The undersigned has reviewed *United States v. Lee*, 217 F.3d 284 (5th Cir.2000), *United States v. Adams*, 174 F.3d 571 (5th Cir.1999), *United States v. Manning*, 787 F.2d 431 (8th Cir.1986), *United States v. Brandt*, 717 F.2d 955 (6th Cir.1983), and *United States v. Hogan*, 906 F.Supp. 455 (C.D.Ill. 1995), but finds these cases of limited assistance because they do not address the present version of 16 U.S.C. § 704(b)(1) and/or 50 C.F.R. §§ 20.11(g)-(k) and 20.21(i)(1)(i) and (2). The present version of 16 U.S.C. § 704(b)(1) and 50 C.F.R. §§ 20.11(g)-(k), 20.21(i)(1)(i) and (2) were in effect and are cited in *United States v. Marston*, 175 F.Supp.2d 1349 (S.D.Ala.2001). However, the undersigned finds the analysis in *Marston* of limited value because the court relied on Alabama regulation 220-2-.114 to find the United States failed to prove beyond a reasonable doubt that the dove field was baited. *Marston*, 175 F.Supp.2d at 1361-62. Specifically, the court in *Marston* considered Sam Marston's actions in the context of the Alabama regulation and found the wheat seed planting was consistent with normal agricultural practices in Alabama because there was a bona fide attempt to cover the wheat seed by cultipacking. *Id.* By contrast, here the defendants are alleging a seed spill occurred on Field 2 and a combination of over-spray and seed spill occurred on the Oil Road and that these incidents are consistent with normal agricultural practices in Kentucky.

was spread earlier than the official planting date recommendations of the State Extension Specialist of the Cooperative Extension Service of the United States Department of Agriculture ("USDA") for a winter wheat crop (October 1–15) or a livestock grazing plot (September 15–30) in Henderson County, Kentucky.

On cross-examination, however, the Government's expert agreed that the state extension specialist recommends planting wheat as early as mid-August in order to prevent soil erosion following a tobacco harvest. He also agreed that a mid-August planting would provide vegetative cover to attract deer by the start of bow hunting season on September 15th. The United States does not dispute that defendants seeded both fields by the same method in August or that the seed count in Field 1 was within permissible limits. Nor has it rebutted the random seed samples Mr. Strassweg took in Field 2 that essentially show, with the exception of the alleged seed spill area, the seed count in Field 2 was in accordance with the recommendations of the state extension specialist.

The undersigned concludes that defendants were not engaged in a normal agricultural planting within the meaning of § 20.11(g) because the purpose of the planting was to establish forage to attract deer and to prevent soil erosion, rather than "for the purpose of producing and gathering a crop".[13][14] However, in light of defendants' purpose of preventing soil erosion, the undersigned finds defendants were engaged in a normal agricultural operation within the meaning of §. 20.11(h) [15] or a normal soil stabilization practice within the meaning of § 20.11(i) [16] when they spread wheat seed on both fields in August of 2002. This of course fails to address the spillage from the wheat seed spreader.

The Government's evidence demonstrates the highest concentration of wheat seed in Field 2 was located in the two strips where the Fish & Wildlife officers took the seed samples. The Government's evidence also shows the seed count in each of those seed samples far exceeded the

13. The evidence shows that the state extension specialist for Kentucky has not issued recommendations that classify wildlife food plots as a legitimate, normal agricultural operation. Thus, to be a normal agricultural planting the seed must be planted in accordance with the state extension specialist's official recommendations for production of a crop that is harvested. *See* 50 C.F.R. § 20.11(g) and Defendants' 8 [Director's letter of June 22, 2000].

14. Defendants have also argued this was a normal agricultural planting, within the meaning of 50 C.F.R. § 20.11(g), because the planting date the Kentucky Department of Fish and Wildlife Resources recommends for a deer food plot is August 15 through September 15 (Defendants' Exhibit 35 at 5). The undersigned finds no merit to this argument because the Director of the United States Department of the Interior, Fish and Wildlife Service, in a letter dated June 22, 2000 (Defendants' Exhibit 8) and 50 C.F.R. § 20.11(g) indicated the Cooperative Extension Service

of the USDA must issue the official planting recommendation. Moreover, defendants' own expert indicated that as far as he knows the person with that authority in Kentucky has not made recommendations for the planting of wildlife food plots. Furthermore, defendants reliance on this planting recommendation is specious at best because they did not follow the seed mix (wheat and orchard grass) portion of the recommendation (Defendants' Exhibit 35 at 5).

15. Since defendants planted seed to prevent soil erosion in accordance with official recommendations of the state extension specialist, they were engaged in a normal agricultural operation within the meaning of 50 C.F.R. § 20.11(h).

16. Since defendants planted seed to prevent soil erosion in accordance with official recommendations of the state extension specialist, they were engaged in a normal soil stabilization practice within the meaning of 50 C.F.R. § 20.11(i).

official seed count recommendations of the state extension specialist. The Government has not, however, rebutted defendants' showing that a broken cyclone wheel on the seed spreader caused an accidental seed spill in that part of Field 2 (approximately 600 feet) or that this type of accident is not uncommon during the planting process.

This takes us to the question, what happens if an accidental seed spill occurs while an individual is engaged in a normal agricultural operation or a normal soil stabilization practice? That is essentially what defendants claim happened. Defendants take the position that §§ 20.21(i)(1)(i) and (2) allowed them to hunt over the field because at the time the spill occurred they had no intent to bait the field.

■ After carefully reading §§ 20.11(j) and (k) [17] the undersigned concludes it is the *effect* the spill could have on migratory game birds that must be considered in determining whether an area is baited, *not the intent* of the individual that caused the spill. In reaching this conclusion, the undersigned notes that subparts (j) and (k) ask "could" the spill "serve as a lure or attraction for migratory game birds"? Thus, if a seed spill "could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them," then it is a baited area and will remain so for "ten days following the complete removal of all" the seed. 50 C.F.R. § 20.11(j).

The undersigned notes, however, that a field seeded in accordance with the official recommendations of the state extension specialist could serve as a lure or attraction for migratory game birds. For this reason, the undersigned believes the official recommendations of the state extension specialists serve as an objective threshold when evaluating whether a seed spill could serve as a lure or attraction for migratory game birds. *See* 50 C.F.R. §§ 20.11(g), (h), and (i); 20.21(i)(1)(i) and (2). If the quantity of seed spilled exceeds the official seed rate recommendations of the state extension specialist then the seed spill must be cleaned up and ten days must pass before hunters can attempt to take migratory game birds on or over the area of the spill.[18] This interpretation is consistent with §§ 20.21(i)(1)(i) and (2) [19] which

---

17. The regulations define baited area and baiting as follows:

(j) *Baited area* means any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them. Any such area will remain a baited area for ten days following the complete removal of all such salt, grain, or other feed.

(k) *Baiting* means the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them."

50 C.F.R. §§ 20.11.

18. True, the testimony evidence shows that seed spills are a normal occurrence on farms and that farmers usually do not bother to clean up the spills. Essentially, the regulations do not change the normal practices of farmers unless a farmer intends to hunt or let others hunt migratory game birds on or over the area of the spill.

19. The relevant portions of § 20.21 read as follows:

"Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds:

(i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:

(1) the taking of any migratory game bird, including water fowl, coots, and

allow the hunting of doves over lands or areas seeded in accordance with the official recommendations of the state extension specialist "that are not otherwise baited." In short, the regulations do not, as defendants contend, create an exception that allows hunting on or over the area of the spill if the spill is accidental.

Mr. Strassweg's testimony indicates that he and Messrs. Krohn and Romain inspected the spill on August 17th and they perceived it as a dove attraction problem given their plans to hunt the field on September 1st.[20] According to Mr. Strassweg, this is why Mr. Romain attempted to disc the excess seed into the ground on that date. The Government's seed samples, taken on August 30th and 31st, demonstrate that Mr. Romain's efforts on August 17th were unsuccessful because excessive amounts of wheat seed that could serve as a lure or attraction for doves remained exposed.[21] Despite their perceiving the spill as a dove attraction problem on August 17th, Messrs. Strassweg, Krohn and Romain did nothing further to correct the problem over the next fourteen days.[22] Instead, they proceeded to enjoy the benefit of the spill. On the fifteenth day, September 1st, Mr. Romain disced the area of the spill before the 11:00 o'clock start of the dove hunt. According to Mr. Strassweg, an article in the local paper about dove hunting and baiting motivated their decision to disc the area of the seed spill that morning. Notably, they did not inspect the area before they decided it should be disced. This speaks volumes about their apparent concern that the area of the spill might be viewed by Fish and Wildlife officers as baited. Further, the video footage taken by Officer Rich on September 1st as well as his testimony indicates that the excess seed from the spill could have served as a lure or attraction for doves. Yet Messrs. Strassweg and Krohn decided to hunt on or over that land or area. In sum, the undersigned finds that the United States has proven beyond a reasonable doubt that Messrs. Strassweg and Krohn did take and attempt to take migratory game birds (doves) on or over a baited area and they knew or reasonably should have known that the area was a baited area, in violation of the Migratory Bird Treaty Act.

■ The undersigned will now address the wheat seed found on a portion of the Oil Road. Again, regardless of how the

---

cranes, on or over the following lands or areas that are not otherwise baited areas—

(i) Standing crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested crop lands; or lands or areas where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice; ...

(2) The taking of any migratory game bird, except water fowl, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the

result of a normal agricultural operation."

**20.** In conducting this analysis the undersigned has not considered Special Agent Moore's testimony or his memorandum summarizing the interview of Mr. Romain.

**21.** The Government's seed samples demonstrate the seed quantity far exceeds the recommended seed rates of the state extension specialist.

**22.** Photographs taken on August 30th and 31st as well as testimony from Fish and Wildlife Resources officers that inspected the field on those dates indicate the ground had not recently been disced. Additionally, Mr. Strassweg made no mention of remedial efforts during this time frame.

seed wound up on the Oil Road, it is the effect the exposed seed could have on migratory game birds that must be considered in determining whether it was a baited area. 50 C.F.R. §§ 20.11(j) and (k). Thus, if the seed spill "could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them," then it is a baited area and will remain so for "ten days following the complete removal of all" the seed. 50 C.F.R. § 20.11(j). The undersigned notes that there is no official seed rate recommendation for dirt roads because the Government's expert testified there is no agricultural purpose to top seeding a dirt road. Therefore, any quantity of seed on the dirt road "could serve as a lure or attraction for migratory game birds" and should have been cleaned up ten days before hunters could attempt to take doves on or over the area of the spill. *See* 50 C.F.R. §§ 20.11(g), (h), (i), and (j); 20.21(i)(1)(i) and (2). This interpretation is consistent with §§ 20.21(i)(1)(i) and (2) which allow the hunting of doves over lands or areas seeded in accordance with the official recommendations of the state extension specialist "that are not otherwise baited".

The evidence shows that prior to and on the day of the hunt there was wheat seed on a portion of the Oil Road, specifically the portion that runs along the eastern edge of Field 1. There are 51 wheat seeds in the sample taken from a high seed concentration area on the Oil Road. Additionally, the video footage taken by Officer Rich on September 1st as well as his and Captain Boggs' testimony indicate that the seed on the Oil Road could serve as a lure or attraction for doves. Yet Mr. Krohn

decided to hunt in the area where the southwest corner of Field 2 and the Oil Road meet. In sum, the undersigned finds that the United States has proven beyond a reasonable doubt that Mr. Krohn did take and attempt to take migratory game birds (doves) on or over a baited area and he knew or reasonably should have known that the area was a baited area, in violation of the Migratory Bird Treaty Act.

■ The undersigned will now address the aiding and abetting charge against Mr. Romain. Since the United States has satisfied its burden as to the charge against Messrs. Strassweg and Krohn, it has also proved beyond a reasonable doubt that the underlying crime was committed which is the first element of the aiding and abetting charge against Mr. Romain. *Sixth Circuit Instruction § 4.01, Sixth Circuit Pattern Criminal Jury Instructions* (1991). In addressing the remaining elements of the charge, the undersigned considered the evidence discussed above, as well as Special Agent Moore's testimony and the memorandum of interview he prepared.[23] Specifically, the evidence shows that Mr. Romain perceived the seed spill in Field 2 as a dove attraction problem. Further, he allowed the problem to exist until September 1st when he attempted to clean it up or conceal it by discing, within a few minutes before Messrs. Strassweg and Krohn began hunting. Finally, he allowed Messrs. Strassweg and Krohn, as well as others, to hunt over the baited area on September 1st despite the ten day restriction articulated in 20.11(j). In sum, the undersigned finds that the United States has proven beyond a reasonable doubt that Mr. Romain helped Messrs. Strassweg

**23.** The undersigned has discounted a portion of Special Agent Moore's testimony and the memorandum of interview (Defendants' Exhibit 38). Specifically, that Mr. Romain reported wheat was sowed and then disced into the ground during the week immediately preceding opening day of dove hunting season. Photographs taken on August 30th and 31st as well as testimony from Fish and Wildlife Resources officers who inspected the field on those dates indicate the ground had not recently been disced.

and Krohn to commit the underlying crime and that he intended to help them commit the crime. *Id.* Therefore, the United States has satisfied its burden as to all of the elements of the aiding and abetting charge against Mr. Romain.

## CONCLUSION

The undersigned finds defendants Jack Strassweg and Rick Krohn GUILTY of the Superseding Information charge that they did take and attempted to take, migratory game birds (doves) on or over a baited area and that they knew and reasonably should have known the area was baited, in violation of the Migratory Bird Treaty Act. The undersigned finds defendant Clifford Romain GUILTY of the Superseding Information charge that he aided and abetted co-defendants Jack Strassweg and Rick Krohn in their violation of the Migratory Bird Treaty Act.

## ORDER

IT IS HEREBY ORDERED that defendants Jack Strassweg and Rick Krohn are GUILTY of taking and attempted to take, migratory game birds (doves) on or over a baited area and that they knew and reasonably should have known the area was baited, in violation of the Migratory Bird Treaty Act, as charged in Count 1 of the Superseding Information.

IT IS HEREBY ORDERED that defendant Clifford Romain is GUILTY of aiding and abetting co-defendants Jack Strassweg and Rick Krohn in their violation of the Migratory Bird Treaty Act, as charged in Count 1 of the Superseding Information.

IT IS FURTHER ORDERED that defendants' motion for judgment of acquittal is DENIED.